Clarissa S. THOMPSON et al.

v.

COUNTY SCHOOL BOARD OF ARLINGTON COUNTY, VIRGINIA, et al.

Civ. A. No. 1341.

United States District Court
E. D. Virginia,
Alexandria Division.

March 1, 1962.

Frank D. Reeves, Washington, D. C., Otto L. Tucker, Alexandria, Va., and James M. Nabritt, III, New York City, for plaintiffs.

James H. Simmonds and Frank L. Ball, Arlington, Va., for defendants.

LEWIS, District Judge.

Another facet of this case is now before the Court for adjudication, namely, the defendants' motion to dissolve the injunction entered herein on the 31st day of July, 1956, 144 F.Supp. 239, upon the grounds hereinafter discussed.

Proper consideration requires a brief review of the events leading up to the institution of this suit and the numerous proceedings had subsequent thereto.

Prior to May 17, 1954, in compliance with the laws of Virginia, Arlington County maintained a segregated school system. On that date the Supreme Court of the United States in a unanimous opinion [1] invalidated the "separate but equal doctrine". Under date of May 31, 1955, the Supreme Court of the United States [2] remanded the cases to the district courts "to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases." The Court further stated:

"School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles."

In compliance therewith, the Arlington County School Board on January 14, 1954, assuming that the Virginia Legislature would enact the recommendations of the Gray Commission, adopted a resolution, providing among other things that the Board would continue the policy of determining school attendance areas on a geographical basis and that integration would be permitted in certain elementary schools in the Fall of 1956, in certain junior high schools in the Fall of 1957, and in certain high schools in the Fall of 1956.

Shortly thereafter the Virginia Legislature adopted certain statutes affecting the public school system in Virginia, among which was one creating the State Pupil Placement Board and divesting the local school boards of the power to assign and place students in the local school system.

The plaintiffs instituted this suit May 17, 1956, praying for a permanent injunction enjoining the School Board, the Division Superintendent, their successors in office, their agents and employees from refusing to admit the infant plaintiffs or other children similarly situated in the Arlington schools on a nondiscriminatory basis.

After a full hearing, this Court, on July 31, 1956, entered an injunction, the pertinent portion of which is as follows:

"Effective at the time and subject to the conditions hereinafter stated, the defendants, their successors in office, agents, representatives, servants, and employees be, and each of them is hereby, restrained and enjoined from refusing on account of race or color to admit to, or enroll

1. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873;

2. Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

or educate in, any school under their operation, control, direction, or supervision any child otherwise qualified for admission to, and enrollment and education in, such school."

Subsequent proceedings in this Court involved the power of the defendants to admit the plaintiffs to Arlington County schools in view of the existing state law divesting them of placement duties; the establishment of proper criteria for the assignment of students; the review of certain assignments; the placement of some of the plaintiffs by court order; and other matters not germane to a determination of the motion now before the Court.

Defendants' motion to dissolve the aforesaid injunction was filed November 13, 1961. In response thereto, plaintiffs on December 28, 1961, filed a motion for further relief and a motion to intervene. On February 5, 1962, the date set for hearing of all pending motions, the plaintiffs requested that they be permitted to withdraw their motions and that the Court consider the motion for further relief as an answer to the motion to dissolve; the request, without objection, was granted. During the hearing, the Court, on its own motion and without objection, permitted the plaintiffs to amend their original suit, to allege that continued enforcement of the attendance area boundaries for Arlington's all-Negro schools which were established on the basis of race as a part of a segregated system and have remained subsequently unchanged, is unconstitutional, invalid and in violation of the injunction of this Court, and that the policy of the Arlington County School Board as enumerated in paragraph 3 of its rules and policies as to admissions, namely, "that no child shall be compelled to attend a school in which his race is in the minority", is unconstitutional and invalid and denies to Negro pupils equal protection of the law and due process as guaranteed by the 14th Amendment.

Pursuant to Section 22–232.18 to 22–232.31 of the Code of Virginia, the authority for the placement of pupils in the Arlington County schools was revested in the School Board of Arlington County. Pursuant thereto, under date of March 16, 1961, the Board adopted Rules and Policies as to Admission and Procedures for Placement and Assignment of Pupils in the Arlington County School System.

A careful examination of these rules clearly indicates that they are facially nondiscriminatory. The evidence, discloses that they have been strictly enforced as to all, regardless of race, color or creed. All students in all grades are placed and assigned to the school district in which they reside. Attendance areas or districts are fixed by the shcool board from time to time. They have remained substantially unchanged since 1949 except where necessitated by a growing population which required the erection of many new school buildings.

Originally, school boundaries were established by taking into consideration the size and location of the physical plant, the number of pupils to be accommodated, the distance between the residence of the child and the school, the traffic encountered en route, together with the purpose of carrying neighborhoods into the schools intact. These criteria have been followed in the establishment of attendance areas for new schools as erected and in the amendments of old attendance areas when and as necessitated.

There is no evidence in this case to sustain the charge that the geographical boundaries of the Hoffman-Boston and Langston schools were either established or are being maintained to perpetuate segregation.

The validity of the attendance areas of the Arlington schools and particularly the areas for the Hoffman-Boston and Langston schools, has been before this Court in several of the proceedings involving the placement of individual pupils. Judge Bryan, in his findings of fact and conclusions of law, reported in D.C., 166 F.Supp. 529, stated:

"The court is of the opinion that Attendance Area, Overcrowding at

Washington and Lee, and Academic Accomplishment clearly are valid criteria, free of taint of race or color. It concludes also that these criteria have been applied without any such bias."

Again on July 25, 1959, Judge Bryan affirmed the use of the foregoing criteria and upheld the denial of the application for transfer of ten pupils on the ground that they lived within the Hoffman-Boston High School Attendance Area (which is substantially the same now as it was then).

As to the Hoffman-Boston Attendance Areas, this Court said:

"Considering school bus routes, safety of access and other pertinent factors, it cannot be found that the School Board's assignments are arbitrary or predicated on race or color. The bounds of Hoffman-Boston district do not deprive those within it of any advantage or privilege. Actually, they are afforded schools of better pupil-teacher ratio and of less congestion than any in the County. Proximity is not the only test. School divisions must at some points disregard neighborhood lines. The court cannot draw the boundaries for attendance areas."

Again on September 16, 1960, Judge Bryan, speaking for this Court, upheld the denial of the application of eight pupils for transfers to other schools solely because they lived in the Hoffman-Boston High School Attendance Area or the Langston Elementary School Area. He stated:

"Additionally, the petitioners complain that the school districts still follow the old lines that were set up in past years under the law to effect racial differentiation. They point to the Hoffman-Boston and Langston districts as still defined by the boundaries originally established for those areas, which are the two parts of the county where the negro population has historically been concentrated. These, it is urged, are no longer logical divisions and they serve to perpetuate the outlawed segregation.

"On residence disqualifications, transfers have been denied [certain students]. [Some of them] reside in the Langston attendance area and [some] in the Hoffman-Boston. Ignoring the Hoffman-Boston lines on the assumption, arguendo, that they are vestiges of segregation as the petitioners charge, still the assignments there of [certain of these students] do not necessarily evince discrimination. They wish to transfer to Wakefield High School, but their homes are nearer Hoffman-Boston. Then, too, there are other reasons undergirding this allocation, such as neighborhood and traffic considerations. Certainly, the decision of the Board is not without substantial evidential ground.

"[Certain pupils] want to go to Woodlawn School. But assuming invalidity, again arguendo, in the Langston district boundaries, and with these lines erased, the Board's action still does not appear unreasonable. These four students are inhabitants of a single neighborhood, almost as close to Langston School as to Woodlawn. Their assignment to Langston can be as consistently accounted for by these circumstances as by an intention to foster segregation. The projection of the two jaws from the Woodlawn district northwardly might be argued as demonstrating a purpose to effectuate segregation, but this is only so in appearance. The suspicion is dispelled both by a consideration of the purpose of the Board to carry neighborhoods into the schools intact, as well as by similar extensions of Page, Maury, McKinley, and other districts in which only white children are concerned. At all events, the determination was one well within the discretion of the Board, and as it may fairly rest on non-racial grounds, the Court will

not presume the Board was improperly motivated."

This case has been before the Court of Appeals for the Fourth Circuit, 252 F.2d 929, 240 F.2d 59, on several occasions, wherein the aforesaid holdings of Judge Bryan have been under review. His opinion was affirmed in each instance. In fact, the plaintiffs did not question or contend the established attendance areas for these schools were invalid.

In Jones v. School Board of the City of Alexandria, 278 F.2d 72, the Court of Appeals for the Fourth Circuit expressly recognized that residence and academic tests may be applied in determining what schools children shall attend, provided factors of race or color are not considered.

The same principle was reaffirmed in Dodson v. School Board of Charlottesville, 4 Cir., 289 F.2d 439. See also Brown v. Board of Education of Topeka, D.C., 139 F.Supp. 468, wherein it was stated:

> "If it is a fact, as we understand it is, with respect to Buchanan School that the district is inhabited entirely by colored students, no violation of any constitutional right results because they are compelled to attend the school in the district in which they live."

See also Allen v. School Board of the City of Charlottesville, D.C., 203 F.Supp. 225, decision rendered December 18, 1961, wherein Judge Paul upheld the geographical assignment of public elementary students and eliminated from the plan of assignment (for high schools) all factors except that of residence.

■ The plaintiffs, without specifically contending that assignment based solely on residency is discriminatory per se, contend that the attendance areas as fixed by the Arlington County School Board for the Hoffman-Boston and Langston schools are unconstitutional, because the attendance areas of these schools were defined so as to include therein as many Negroes as practical and to exclude therefrom as many white residents as could be excluded.

This contention is not supported by the evidence. The attendance areas of these schools were established prior to the Brown decision and have been publically reviewed as late as 1960, on which occasion no citizen of Arlington, Negro or white, objected to the attendance areas as established for these schools. A very substantial number of Negro junior and senior high school students reside in sections of Arlington County not within the Hoffman-Boston Attendance Area, all of whom are assigned to the school (predominantly white) nearest their residences. Likewise, Negro students attending elementary schools residing in various sections of the county are assigned to the schools (predominantly white) nearest their homes.

■ The plaintiffs cannot assign themselves to the schools of their choice. That responsibility must rest with the proper school authorities. The Federal Courts manifestly cannot operate the schools. All that they have the power to do in the premises is to enjoin violation of constitutional rights in the operation of schools by state authorities.[3]

The evidence further discloses that all Arlington County schools are being operated on a nondiscriminatory basis not only in assignments but also in educational, athletic, dramatic and social activities.

In support of their contentions the plaintiffs rely upon Taylor v. Board of Education of the City School District of New Rochelle, D.C., 195 F.Supp. 231. In that case the Court had found that

> "the Board of Education had gerrymandered school district lines so as to confine Negroes within the Lincoln district, and had allowed white children living within the district to transfer to other schools."

Such is not the fact in this case.

■ Having found that the Arlington County School Board acted in good faith

3. Carson v. Board of Education of McDowell County, 4 Cir., 227 F.2d 789.

and in accordance with governing constitutional principles in establishing and maintaining school attendance areas, we next turn to the question of the validity of Rule 3, Paragraph 3 of the Rules of Admission which provides "no child shall be compelled to attend a school in which his race is in the minority". The plaintiffs contend this section of the rules is unconstitutional and invalid and denies to Negro plaintiffs equal protection of the law and due process guaranteed by the 14th Amendment. However, they have failed to cite any authority, and the Court has found none, that supports this contention. The Brown case does not require complete or enforced integration of the public school system. The late Chief Judge Parker of the Fourth Circuit expressly so held in Briggs v. Elliott, D.C., 132 F.Supp. 776, wherein he stated:

> "It (the Brown case) has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. * * * The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation."

It is obvious that Rule 3 contemplates that there should be no compulsory integration.

The only charge of discrimination in this case is that Negro children residing in the Hoffman-Boston Attendance Area are not permitted to transfer to other schools of their choice, whereas certain children residing in the same attendance area are permitted to transfer. But a similar condition in converse obtains in other attendance areas, where resident Negro children are permitted to transfer to Hoffman-Boston while certain children are restricted to the school located within their residential attendance area. The School Board, in requiring Negroes residing in the Hoffman-Boston and Langston areas to attend those schools, is merely following the principle of requiring pupils to attend the schools within their area of residence.

To prohibit the right of transfer, granted to both Negro and white pupils under like condition, would be to require assignment of all pupils solely on the basis of residence, resulting in the enforced integration of all public schools. It is not believed that the Constitution or the cases cited so require. Further, the evidence in this case indicates that a substantial number of both Negro and white parents desire the right to send their children to a school in which a majority of their race attend because they have both applied for and been granted such transfers.

Another alternative would be to allow pupils of both races to attend any school they might choose anywhere in the county. To do so would bring only chaos to the orderly administration of the public schools. Some schools would be practically deserted; others would be crowded far beyond physical capacity.

A similar right of transfer has been adopted by the Charlottesville public schools and was approved by Judge Paul on December 18, 1961.

Both the Fifth[4] and Sixth[5] Circuit Courts of Appeals have expressed views on this subject. The Sixth Circuit, in upholding the constitutionality of the Voluntary Transfer procedure incorporated in the Nashville plan said:

> "If the child is free to attend an integrated school, and his parents

---

4. Boson v. Rippy, 285 F.2d 43.

5. Kelley v. Board of Education of the City of Nashville, 270 F.2d 209.

626

voluntarily choose a school where only one race attends, he is not being deprived of his constitutional rights. It is conceivable that the parent may have made the choice from a variety of reasons—concern that his child might otherwise not be treated in a kindly way; personal fear of some kind of economic reprisal; or a feeling that the child's life will be more harmonious with members of his own race. In common justice, the choice should be a free choice, uninfluenced by fear of injury, physical or economic, or by anxieties on the part of a child or his parents. The choice, provided in the plan of the Board, is, in law, a free and voluntary choice. It is the denial of the right to attend a non-segregated school that violates the child's constitutional rights."

The Fifth Circuit, in declaring a somewhat similar provision in the Dallas Plan[6] unconstitutional, noted that "its application might tend to perpetuate racial discrimination" and was at variance with the Texas statute giving the School Board wide discretion in transferring pupils.

There is no evidence in this case indicating the voluntary transfer provision of the Arlington Rules of Admission either has been or will be used to perpetuate racial discrimination. To the contrary, all vestige of racial discrimination has been eliminated from every facet of the Arlington school system. Further, there is no Virginia statute, such as exists in Texas, establishing criteria guiding local school boards in assigning and transferring pupils within the public schools.

Rule 3 is not unconstitutional on its face, or as applied in Arlington County.

We next come to the merits of defendants' motion to dissolve.

The Supreme Court of the United States in setting forth the procedure to be followed in eliminating racial discrimination in public education stated:

" * * * Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility. * * *

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. * * *

" * * * They will also consider the adequacy of any plans the defendants (school authorities) may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases."[7]

None of the plaintiffs in this case are now asserting a denial of any constitutional right. All issues raised by the pleadings have been adjudicated. All pupils residing in Arlington County are assigned to the school district in which they reside, regardless of race or color. All of the facilities and activities under the control of the Arlington County School Board are being administered on a nondiscriminatory basis—educational, athletic, dramatic, social.

This Court is of the opinion that the Arlington County public schools are being administered on a racially nondiscriminatory basis and that the transition period referred to by the Supreme Court has expired, and that there is no evidence before the Court indicating that

6. "6. The following will be regarded as some of the valid conditions to support application for transfer:
"a. When a white student would otherwise be required to attend a school previously serving colored students only;
"b. When a colored student would otherwise be required to attend a school previously serving white students only;

"c. When a student would otherwise be required to attend a school where the majority of students in that school or in his or her grade are of a different race." Boson v. Rippy, supra.

7. See Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 873.

the Arlington County School Board will not continue to operate the public schools in accordance with the governing constitutional principles.

■ Therefore there is no further justification for the injunction of July 31, 1956.

"It is well settled that an injunctive order may be modified or dissolved in the discretion of the court when conditions have so changed that it is no longer needed or as to render it inequitable." Tobin v. Alma Mills, 192 F.2d 133 (4 Cir., 1951).

An order striking this suit from the current docket of this Court will be accordingly entered.

Nothing herein contained shall be construed as prohibiting any person from instituting an appropriate suit asserting the denial of any of his constitutional rights.