Gloria BROOKS, an infant, by Ethel A. Brooks, her mother and next friend, et al., Appellants,

v.

COUNTY SCHOOL BOARD OF ARLINGTON COUNTY, VIRGINIA, et al., Appellees.

No. 8708.

United States Court of Appeals Fourth Circuit.

Argued Sept. 24, 1963.

Decided Oct. 31, 1963.

**304**

James M. Nabrit, III, New York City (Jack Greenberg, New York City, Otto L. Tucker, Alexandria, Va., S. W. Tucker, Emporia, Va., and Frank D. Reeves, Washington, D. C., on the brief), for appellants.

Frank L. Ball, Arlington, Va. (James H. Simmonds, Arlington, Va., on the brief), for appellees.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

SOBELOFF, Chief Judge.

The order of the District Court which we are called upon to review in this appeal is one entered on March 1, 1962, dissolving the injunction issued on July 31, 1956, against racial discrimination in the public schools of Arlington County, Virginia.

After the passage of the 1956 injunction, there ensued appellate proceedings in this court, sub nom. School Board of City of Charlottesville, Virginia, et al. v. Allen, 240 F.2d 59 (4th Cir. 1956), which resulted in affirmance of the injunctive order. The School Board then sought certiorari, which was denied by the Supreme Court of the United States, School Bd. of Arlington County v. Thompson, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664 (1957). These steps and supplementary proceedings in the District Court occasioned delay of the injunction's effective date until September, 1957.

In September the School Board sought further suspension of the injunction. This the District Court refused. On the opening day of the school term seven Negro pupils, who applied for and were denied admission to all-white schools, moved the District Court for further relief. The court reviewed the Board's various defenses and, finding that the pupils had been excluded on the basis of race, ordered their admission. Again the effective date of the order was stayed pending the outcome of an appeal by the School Board. This court affirmed the grant of relief to the plaintiffs. County School Board of Arlington County, Virginia v. Thompson, et al., 252 F.2d 929 (4th Cir. 1958), and the Board again sought certiorari in the Supreme Court, which was denied on May 19, 1958, 356 U.S. 958, 78 S.Ct. 994, 2 L.Ed.2d 1065 (1958). The effect of the stay order and the ensuing litigation was further to postpone desegregation.

█ This did not exhaust the delays. In September, 1958, the School Board initiated a "request for guidance." Again the effective date for compliance was moved forward, this time to February, 1959. This order too was appealed by the Board, but applications for further delay were denied by the District Court on January 28, 1959, by this court on January 30, 1959, and by the Chief Justice of the United States on January 31, 1959. Thus, the objective fact is that not until four Negro pupils were admitted to white schools in February, 1959, was there any compliance with the injunction of July 31, 1956.

A parallel lawsuit was in progress involving twenty-six other Negroes whose applications for transfer had been denied in September, 1958. On an appeal, decided sub nom. Hamm v. County School

Board of Arlington County, Virginia, 264 F.2d 945 (4th Cir. 1959), this court directed the District Court to reconsider the rejected applications, because it appeared that tests had been applied to the plaintiffs to which white pupils seeking transfers were not subjected. It was further pointed out that, when the Board and the District Court considered these cases, all officials concerned were conscious of the existence of Virginia's Massive Resistance Statutes threatening the closing of any schools to which Negroes might be admitted. These statutes having been invalidated on January 19, 1959, by simultaneous decisions of the Supreme Court of Appeals of Virginia in Harrison v. Day, 200 Va. 439, 106 S.E.2d 636, and a three-judge federal district court, James v. Almond, D.C., 170 F. Supp. 331 (E.D.Va.), our remand to the District Court was with a direction to require the School Board to re-examine the plaintiffs' applications. This was coupled with a specific admonition that the Board should not treat its past actions as valid precedents. On July 25, 1959, the District Court ordered the Board to admit 12 of the plaintiffs to formerly all-white schools, and on September 16, 1959, it ordered the admission of seven additional Negro pupils who had been rejected and as to whom the District Court's order noted that the Board had disclosed no ground justifying its action.

The litigation was not yet ended. As late as July 21, 1960, the District Court again had occasion to order the Board to admit 11 Negro pupils who, the court found, had been improperly refused admission.

The present phase opened on November 13, 1961, when the School Board moved to dissolve the order of injunction passed on July 31, 1956. Therein the Board alleged that its policy of segregation no longer existed and the injunction was unnecessary. The motion was accompanied by a report advising the court that, pursuant to authority of state law, Va.Code Ann. §§ 22–232.18 to .31 (1962 Cum. Supp.), the Arlington County governmental body had adopted an ordinance electing to remove the school assignment power from the state Pupil Placement Board to the local School Board and that on September 21, 1961, the Board had adopted a resolution rescinding the policy of segregation which it had formally reiterated as late as September 21, 1959. Also attached to the report was the Board's rule that attendance shall be in accordance with residential areas fixed by the School Board from time to time; but this rule was specifically made subject to the policy that no child shall be compelled to attend a school in which his race is in the minority.

Opposing dissolution of the injunction, the plaintiffs insisted that the defendants have not complied with their duty to bring about the elimination of racial discrimination in the public school system and have evinced no intention of doing so; that the course of action pursued by the Board will continue indefinitely the racially segregated character of certain schools; that the boundaries of attendance areas were still those initially drawn to maintain separate schools for the two races; and that the continued maintenance of such boundaries was designed to perpetuate segregation. The plaintiffs made specific recitals as to various schools in Arlington County, the substance of which was that Negroes, solely because they are Negroes, and unlike white children of similar age and qualifications, are required to attend certain schools accommodating children of all grades from kindergarten to grade 12. It was further charged that the School Board always permitted, and continues to permit, all white children residing in the attendance areas of Negro schools to transfer to schools outside the areas of their residence, but refuses such permission when it is sought by Negro children similarly situated; and that the Board seeks to justify such discrimination by citing its policy "that no child shall be compelled to attend a school in which his race is in the minority." The plaintiffs cited recent instances of the application to Negroes of these and other discriminatory practices.

Attendance area maps then in effect in the county were filed by the plaintiffs at the hearing. There was also a stipulation of the parties that there had been no substantial change in the school zones affecting the Negro schools since their original establishment, with the exception of the elimination of the geographically separate area in the northern part of the county which, for the purpose of assigning Negroes but not whites, had theretofore been included in the main Hoffman-Boston district, five miles distant.

The District Court, relying on Kelley v. Board of Education of City of Nashville, 270 F.2d 209 (6th Cir. 1959), held the racial minority transfer rule valid. Since then, however, the Supreme Court in Goss v. Board of Education of the City of Knoxville, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), has authoritatively settled the question to the contrary. Justice Clark, speaking for the unanimous Court, said:

> "It is readily apparent that the transfer system proposed lends itself to perpetuation of segregation. Indeed, the provisions can work only toward that end.
>
> * * *
>
> "Classifications based on race for purposes of transfers between public schools, as here, violate the Equal Protection Clause of the Fourteenth Amendment. * * * The recognition of race as an absolute criterion for granting transfers which operate only in the direction of schools in which the transferee's race is in the majority is no less unconstitutional than its use for original admission or subsequent assignment to public schools.
>
> * * *
>
> " * * * The transfer provisions here cannot be deemed to be reasonably designed to meet legitimate local problems, and therefore do not meet the requirements of Brown." Id. 373 U.S. at 686–689, 83 S.Ct. at 1407–1409, 10 L.Ed.2d 632.

In Jackson v. School Board of Lynchburg, Virginia, 321 F.2d 230 (4th Cir. 1963), this court, following the Goss decision, invalidated the minority racial transfer plan of that city.

In argument before this court it was said that since the Goss decision of the Supreme Court on June 3, 1963, the resolution embodying the racial minority transfer policy has been rescinded by the School Board of Arlington County and a new rule substituted. The new rule does not undertake to put Negro pupils on a parity by granting them the same transfer privileges theretofore enjoyed by white pupils, but forbids all transfers of both white and Negro pupils. Even as this new transfer regulation was announced to us by counsel for the School Board there came from the opposing trial table impugning intimations. We do not yet know how this innovation will operate —whether it will be found non-discriminatory, as the Board affirms, or an impermissible device to freeze the results of earlier discriminatory practices, as the plaintiffs maintain. The question is not now before us, and is noted only as a still unresolved problem touching the administration of the county schools. See Dillard v. School Board of City of Charlottesville, 308 F.2d 920, 924 (4th Cir. 1962).

Counsel for the School Board also brought to our attention a resolution adopted by it one week before the hearing of the appeal, declaring against the consideration of race in all future personnel actions. This measure is worthy of commendation but, again, it is so new that there has been no implementation and no experience under it.

As to the plaintiffs' contention that the Board improperly continues the discriminatory attendance areas, the Board asserted that Negroes had not objected at public hearings called to consider the redrawing of school zones. Counsel for the plaintiffs said that the Negro community was not aware of such hearings. The Board also cited the fact that 146 Negro students were then attending predominantly white schools nearest their resi-

dences. These circumstances, plus the assumed constitutionality of the now invalidated racial minority transfer plan, persuaded the District Court that there is no further need for the injunction. The District Court dissolved the injunction and dismissed the entire case from its docket. Thompson v. County School Bd. of Arlington County, Va., 204 F. Supp. 620 (E.D.Va.1962).

We address ourselves solely to the issue before us; namely, whether the School Board has made a showing sufficient to justify dissolution of the injunction. We do not undertake to adjudicate the merits of matters upon which the parties may be in controversy but which are not directly in issue here, and the only pertinence of which is to reflect conditions bearing on the present need for the injunction.

In dissolving the injunction the District Court cited Tobin v. Alma Mills, 192 F.2d 133 (4th Cir. 1951), cert. denied, 343 U.S. 933, 72 S.Ct. 769, 96 L.Ed. 1342 (1952). It is true, as this court said in Tobin, that an injunction should not be continued "when conditions have so changed that it is no longer needed or as to render it inequitable." But we think that reliance upon this decision is misplaced for the showing made here is inadequate to meet its standard. The fact is that the first step taken by the Board on its own initiative toward compliance with the injunction was on March 16, 1961, when it adopted a pupil assignment program to become effective the following September. The motion to dissolve the injunction as unnecessary followed almost immediately thereafter. Even as of now, it could not possibly be claimed that the record of compliance is more than two years in duration. Obedience to the injunction for so short a time is not sufficient to warrant its termination, even if we were to assume that there has been complete obedience, contrary to the plaintiffs' insistence that in many respects full compliance with the injunction is yet to be achieved.

We have here no long history of sustained obedience, nor any showing of harm to the defendants, and the case therefore is not like Tobin, where the party applying for dissolution of the injunction showed full compliance with its provisions over a period of nine years. In Walling v. Harnischfeger Corp., 242 F.2d 712 (7th Cir. 1957), the dissolution of an injunction was refused despite 12 years of sustained obedience. "Compliance," the court answered, "is just what the law expects." Id. 242 F.2d at 713. More recently the First Circuit reversed a district court order dissolving an injunction after eight years of compliance. The Court of Appeals commented: "The injunction, of course, merely directed appellee to do what the law obliged him to do in the first place." Goldberg v. Ross, 300 F.2d 151 (1st Cir. 1962).

Again, the situation here, unlike Tobin, where specific hardship was shown by the party enjoined, is different since there is no evidence of any hardship or inconvenience in the operation of the schools by reason of the injunction. In United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), where rescission of the injunctive order was denied notwithstanding many years of obedience, Justice Cardozo said:

> "The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression."

It is far from established that the segregated system in the county's schools has been "attenuated to a shadow" or that there is no further need for the injunction, or that its continuance is oppressive. We are not unmindful that many obstructive devices, designed to impede and frustrate desegregation were interposed by forces for which this School Board cannot in fairness be held accountable. Until a comparatively recent date statutory and other obstacles stood in the way of compliance with the law of the

land and the court's order. And it is not our intention to imply any criticism of actions of the District Judge taken during the period in question, for doubtless these were prompted by like compelling conditions. However this may be, compliance began only lately. The long series of lawsuits to attain the effectiveness of the injunction, and the absence of any threat against the Board in all this time or any citation for contempt, strongly argue against any possible claim that continuance of the injunction will result in oppression.

It was declared at the bar of this court that the School Board now contemplates some revision in school districting affecting the Hoffman-Boston Senior High School and perhaps the erection of new school facilities. The plaintiffs, however, recall that the Hoffman-Boston district was originally created for Negroes when the maintenance of the segregated system was the avowed policy and practice, and they stress that Hoffman-Boston remains as it was contrived, a Negro enclave entirely surrounded by white school zones.

The District Court's finding that there is no evidence to sustain the charge that geographical boundaries were established to maintain segregation is clearly erroneous. The testimony offered in the 1957 hearing was made a part of the record in this case. There the Division Superintendent of Schools, called by the plaintiffs as an adverse witness, testified that the Hoffman-Boston facility was established as the only Negro senior and junior high school for the entire county; that this action was based entirely upon race; that the boundaries of the three elementary school districts were fixed in a like manner; and that later the Pupil Placement Board assigned approximately 2000 pupils of all grades, and in each instance without exception whites were assigned to white schools and Negroes to Negro schools, effectively freezing white and Negro children in their racially segregated schools. By stipulation it appears that since the 1957 hearing, except for the disjunction of the non-contiguous

northern territory, the districts remain unchanged. Even assuming that the Board goes through with its announced plan to close the Hoffman-Boston Senior High School, the junior high and the elementary facilities would be unaltered.

We do not now pass upon the validity of existing districts or districts to be created. We cite the situation merely as another indication that the process of transition from segregation to desegregation is not yet finished, since the Board itself apparently recognizes the necessity for future changes to meet demands of the Negro community and to effect better administration of the school system. The School Board has the primary authority and responsibility to bring the school system into complete conformity with the law. Such plans as it may be considering are entirely appropriate for submission to the District Court. See Bradley v. School Board of the City of Richmond, 317 F.2d 429, 438 (4th Cir. 1963). We think that the District Court should continue its supervision as contemplated in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); and Cooper v. Aaron, 358 U.S. 1, 7, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

Like other courts, ours has recognized the complexities involved during a period of transition. Because of this we have tolerated temporary measures falling short of total conformity with constitutional requirements. This, however, does not mean that the mandate should be prematurely withdrawn. Judging with utmost sympathy and understanding the role of the School Board in the long series of burdensome lawsuits that proved to be necessary even with the injunctive order outstanding, we cannot think that the time has arrived to annul the injunction. A good faith beginning of compliance might be a defense to a contempt citation for violating an injunction; it is no ground for rescission. The injunction must be reinstated.

Reversed and remanded.