**CORRECTED OPINION**

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GRACE TUTTLE, a minor by Her Next
Friend, Steven Tuttle; RACHEL
SECHLER, a minor by Her Next
Friend, Charlotte Sechler,
Plaintiffs-Appellees,

v.

ARLINGTON COUNTY SCHOOL BOARD;
MARY H. HYNES, individually and in
her official capacity as Member,
Arlington County School Board;
DARLENE MICKEY, individually and
in her capacity as Member,
Arlington County School Board;
ELIZABETH GARVEY, individually and
in her official capacity as Member,                    No. 98-1604
Arlington County School Board;
ELAINE FURLOW, individually and in
her official capacity as Member,
Arlington County School Board;
FRANK WILSON, individually and in
his capacity as Member, Arlington
County School Board; ROBERT
SMITH, individually and in his
capacity as Superintendent of
Schools, Arlington County,
Defendants-Appellants,

and

DOUGLAS HUFF,
Movant.

**CORRECTIONS MADE BEGINNING ON PAGE 11**

AMERICAN ASSOCIATION OF SCHOOL
ADMINISTRATORS; COUNCIL OF THE
GREAT CITY SCHOOLS; MAGNET
SCHOOLS OF AMERICA; NATIONAL
SCHOOL BOARDS ASSOCIATION; UNITED
STATES OF AMERICA; NATIONAL
ASSOCIATION FOR THE ADVANCEMENT

OF COLORED PEOPLE; THE ARLINGTON
COUNTY CHAPTER OF THE NATIONAL
ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE;
THE LEAGUE OF UNITED LATIN
AMERICAN CITIZENS,
Amici Curiae.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-98-418-A)

Argued: January 27, 1999

Decided: September 24, 1999

Corrected opinion filed: November 1, 1999

Before ERVIN, LUTTIG, and KING, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded by published per
curiam opinion.

_____

**COUNSEL**

**ARGUED:** Steven John Routh, HOGAN & HARTSON, L.L.P.,
Washington, D.C., for Appellants. Linda Frances Thome, UNITED

STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae United States. Philip Andrew Sechler, WILLIAMS & CONNOLLY, Washington, D.C., for Appellees. **ON BRIEF:** Audrey J. Anderson, HOGAN & HARTSON, L.L.P., Washington, D.C.; Carol W. McCoskrie, Assistant County Attorney, ARLINGTON COUNTY ATTORNEY'S OFFICE, Arlington, Virginia, for Appellants. Bill Lann Lee, Acting Assistant Attorney General, Mark L. Gross, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae United States. Bethany E. Matz, WILLIAMS & CONNOLLY, Washington, D.C.; Steven M. Levine, LAW OFFICE OF STEVEN M. LEVINE, Washington, D.C., for Appellees. Naomi E. Gittins, Staff Attorney, Julie Underwood, NSBA General Counsel, NATIONAL SCHOOL BOARDS ASSOCIATION, Alexandria, Virginia; AMERICAN ASSOCIATION OF SCHOOL ADMINISTRATORS, Arlington, Virginia; COUNSEL OF THE GREAT CITY SCHOOLS, Washington, D.C.; MAGNET SCHOOLS OF AMERICA, The Woodlands, Texas, for Amici Curiae Association of School Administrators, et al. Barbara R. Arnwine, Thomas J. Henderson, Robin A. Lenhardt, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C.; Jeh C. Johnson, PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York, for Amici Curiae NAACP, et al.

_____

**OPINION**

PER CURIAM:[1]

The question before this Court is whether an oversubscribed public school may use a weighted lottery in admissions to promote racial and ethnic diversity in its student body. The current appeal is the latest chapter in the history of this Court's involvement in the Arlington County, Virginia public school system.

_____

[1] The opinion in this case was prepared by Judge Ervin, who died before it was filed. The remaining members of the panel continue to concur in what Judge Ervin wrote. The opinion is accordingly filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

Our earlier involvement concerned the desegregation of the Arlington County school system.[2] This preceding chapter was brought to a close in Hart v. County School Bd. of Arlington County, Virginia, where we affirmed the remedial policy of the Arlington County School Board ("School Board") to achieve a unitary school district. 459 F.2d 981, 982 (4th Cir. 1972). The current chapter brings us full circle. In the present case, we examine the admissions policy ("Policy") of the Arlington Traditional School ("ATS"), whose goal was not to remedy past discrimination, but rather to promote racial, ethnic, and socioeconomic diversity.

Two ATS applicants, Grace Tuttle ("Tuttle") and Rachel Sechler ("Sechler"), filed suit under 28 U.S.C.A.§§ 2201, 2202 (West 1994) and 42 U.S.C.A. §§ 1981, 1983 (West 1994) to enjoin the School Board permanently from implementing its Policy. The district court granted the injunction and ordered the School Board to conduct a double-blind random lottery for future ATS admissions. The School Board appealed the decision.

Today, we hold that the School Board's Policy violated the Equal Protection Clause of the Fourteenth Amendment. Since the Supreme Court has not resolved the question of whether diversity is a compelling governmental interest, we assume without deciding that diversity may be a compelling interest and find that the Policy was not sufficiently narrowly tailored to pass constitutional muster.

Although we affirm the district court's holding that the Policy was unconstitutional, we find that the district court abused its discretion when it ordered the School Board to adopt a specific admissions policy. We therefore vacate the permanent injunction and remand to allow an evidentiary hearing in which the School Board may present alternative admissions policies for the district court's review.

_____

[2] Our involvement in the desegregation of the Arlington County public school system is summarized in Brooks v. County School Bd. of Arlington County, Virginia, 324 F.2d 303, 304-05 (4th Cir. 1963).

I.

ATS is an alternative kindergarten, one of three alternative schools operated by the School Board that claims to teach students in a "traditional" format. Admission is not based upon merit but rather solely upon availability.

The currently challenged Policy was created in response to prior litigation. In the earlier case of Tito v. Arlington County School Bd., the district court permanently enjoined ATS from implementing its former admissions policy and ordered the School Board to make "invitations for admissions to the alternative schools[like ATS] in strict order of the lottery selections, for all grade levels, as long as a random lottery procedure continues to be employed." In so doing, the district court concluded that diversity could never constitute a compelling governmental interest and, in the alternative, even if it could, that the earlier program was not sufficiently narrowly tailored to further diversity.

The plaintiff in Tito submitted a proposed Order Granting Declaratory Relief and Permanent Injunction containing a provision that "permanently restrained and enjoined [the School Board] from using race, color or ethnicity as a factor in offering invitations for admission" to ATS. The district court found this provision "overbroad" because "[t]his proposal would go beyond what is necessary to decide the case at hand." The district court added, "[t]he court has ruled that the alternative schools' admissions policy `as implemented' . . . is unconstitutional. The court declines to anticipate and foreclose any attempt by the [S]chool [B]oard to achieve by other means the goals expressed in its admissions policy."

Instead of appealing the Tito decision, the School Board adopted a new Policy in February 1998. This Policy had two goals: (1) "to prepare and educate students to live in a diverse, global society" by "reflect[ing] the diversity of the community" and (2) to help the School Board "serve the diverse groups of students in the district, including those from backgrounds that suggest they may come to school with educational needs that are different from or greater than others."

5

The Policy defined diversity using three equally weighted factors: (1) whether the applicant was from a low-income or special family background, (2) whether English was the applicant's first or second language, and (3) the racial or ethnic group to which the applicant belonged. Through this Policy, ATS sought to obtain a student body "in proportions that approximate the distribution of students from those groups in the district's overall student population."

Under the Policy that ATS implemented in 1998-99 and that is challenged here, ATS accepted applications from the general public without restriction. Because the applicant pool was larger than the number of available positions, ATS offered admission to applicants based on a lottery. In 1998, ATS had 185 applicants for only 69 available positions.

First, ATS offered admission to applicants who were the siblings of older students already attending ATS.[3] In 1998, there were 23 ATS sibling-applicants, leaving 46 positions available for admission to ATS. Next, because the total ATS applicant pool, including siblings, was not within 15% of the county-wide student population percentages for all three factors, a sequential, weighted random lottery among the 162 non-sibling applicants determined the remaining 46

_____

**3** This sibling preference was not challenged in either Tito or the current case.

offers for admission to ATS.[4] The probabilities associated with each applicant's lottery number were weighted, so that applicants from under-represented groups, as defined by the Policy, had an increased probability of selection.[5]

_____

[4] The following table summarizes relevant data on offers of admission at ATS for the 1998-99 school year (J.A. 64, 65, 133):

| Population Subset — County-wide public school students | Applicant pool (including siblings) | Applicants offered admission (including siblings) | Relative lottery weights of each applicant subgroup | Percent of each applicant subgroup (excluding siblings) offered admission |
|---|---|---|---|---|
| **Income Factor** | | | | |
| Low income | 40 % | 13.5 % | 25 % | 2 | 67 % |
| High income | 60 % | 86.5 % | 75 % | 1 | 22 % |
| **First Language Factor** | | | | |
| English | 57 % | 88.1 % | 77 % | 1 | 22 % |
| Non-English | 43 % | 11.9 % | 23 % | 3 | 70 % |
| **Race/Ethnicity Factor** | | | | |
| Asian/Pacific Islander | 10 % | 13.5 % | 13 % | 4 | 20 % |
| Black | 17 % | 8.6 % | 10 % | 11 | 36 % |
| Hispanic | 31 % | 10.8 % | 22 % | 9 | 71 % |
| White | 41 % | 67 % | 55 % | 5 | 23 % |
| Other | < 1 % | -- % | -- % | | |

[5] Each applicant's "lottery weight" was calculated as the product of the individual weights for the three factors. For the relative weights utilized in the lottery for each of the three separate factors, see table supra note 4.

Tuttle and Sechler (the "Applicants") did not have siblings attending ATS. Moreover, they had no increased probability of selection in the lottery based on their diversity factor classifications, and they were not selected for admission in the lottery process. As a result, they did not receive admission offers. The Applicants, by and through their Next Friends, parents Steven Tuttle and Charlotte Sechler, filed a Complaint and a Motion for Preliminary Injunction against the School Board to stop ATS' weighted admission process.

During the preliminary injunction motion hearing, the Applicants moved to consolidate the hearing with a trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2). The School Board objected, arguing that unless the district court accepted as a matter of law that diversity was a compelling state interest, the School Board should be given an opportunity to present evidence on that point. The district court refused to grant the School Board an evidentiary hearing.

On April 14, 1998, without further proceedings, the district court ruled in an unpublished memorandum opinion that the Applicants were entitled to permanent injunctive relief. See Tuttle v. Arlington County School Bd., No. CA-98-418-A, at 11 (E.D. Va. April 14, 1998) (unpublished memorandum opinion). In so ruling, the district court reiterated that as a matter of law, "diversity was not a compelling governmental interest" because the only compelling governmental interest to justify racial classifications was "to remedy the effects of past discrimination." Id. at 8. At the district court's request, the Applicants submitted a proposed order.

The School Board filed two objections to the proposed order. First, the School Board argued that the district court had impermissibly intruded upon the School Board's discretion by ordering it to institute a "double-blind random lottery without the use of any preferences" to admit students to ATS. Second, the School Board objected to being permanently enjoined from not only using race, color, and national origin, but also family income and first language in admitting students to ATS. On April 23, 1998, the district court overruled these objections and entered the proposed order. The next day, the School Board appealed to this Court.

We address three issues on appeal. First, the Applicants argued that the School Board was collaterally estopped from disputing the district

8

court's conclusion of law that diversity is not a compelling interest. Second, the School Board argued that the Policy does not violate the Equal Protection Clause of the Fourteenth Amendment. Third, the School Board argued that the district court's permanent injunction was overbroad.

II.

We review the grant or denial of collateral estoppel de novo. See United States v. Fiel, 35 F.3d 997, 1005 (4th Cir. 1994).

We review racial classifications under strict scrutiny. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995).

There is disagreement among the parties concerning our standard of review of the district court's injunction. The School Board argued that since the district court based its injunction solely upon its interpretation of the applicable law, we should review de novo. See Williams v. United States Merit Sys. Protection Bd. , 15 F.3d 46, 48 (4th Cir. 1994) ("This court reviews a decision pertaining to injunctive relief de novo when it rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance.") (citation omitted). Since the School Board does not challenge the district court's authority to grant an injunction but rather the scope of the injunction granted, we believe that Williams is inapposite here and review the district court's permanent injunction for an abuse of discretion. See Wilson v. Office of Civilian Health and Med. Programs of the Uniformed Servs., 65 F.3d 361, 363 (4th Cir. 1995).

This Court has appellate jurisdiction pursuant to 28 U.S.C.A. § 1292(a)(1) (West 1993 & Supp. 1998) because the present case is an appeal of an interlocutory order granting an injunction.

III.

As a threshold matter, we must address whether the School Board is collaterally estopped from claiming that diversity is a compelling governmental interest because it never appealed the issue in the district court's earlier Tito decision. Collateral estoppel "means simply

9

that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe v. Swenson, 397 U.S. 436, 443 (1970).[6]

After analyzing the relevant factors, we find that the School Board is not collaterally estopped from appealing the district court's legal conclusion that diversity is not a compelling governmental interest. Because the admissions policy in Tito was markedly different than the current Policy, the issues decided in Tito were hardly "identical" to the issues currently before this Court. Since the district court also concluded that the Tito policy was not narrowly tailored, the district court's conclusion of law that diversity could never be a compelling interest was not "necessary" in Tito. Furthermore, the decision in Tito was hardly "final and valid." The Tito injunction was qualified with "as long as [a] random lottery selection procedure continues to be employed," implying that the School Board retained the discretion to choose another random lottery selection procedure. Collateral estoppel, therefore, does not apply in this case.

IV.

The second issue is whether the Policy violates the Equal Protection Clause of the Fourteenth Amendment. Although race and ethnicity comprise only one of the Policy's three diversity factors, it is undisputed that the Policy involves a racial classification. All racial classifications are subject to strict scrutiny. See Adarand, 515 U.S. at 227. Under strict scrutiny, a racial classification must (1) serve a compelling governmental interest and (2) be narrowly tailored to achieve that interest. Id.

_____

[6] "For collateral estoppel to apply, the proponent must establish that: (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue must have been actually determined in the prior proceeding; (3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum." Sedlack v. Braswell Servs. Group, 134 F.3d 219, 224 (4th Cir. 1998).

A.

The first question is whether diversity is a compelling governmental interest. This question remains unresolved. The only circuit to hold that diversity is not a compelling interest is the Fifth Circuit. See Hopwood v. Texas, 78 F.3d 932, 944 (5th Cir. 1996) ("[A]ny consideration of race or ethnicity . . . for the purpose of achieving a diverse student body is not a compelling interest under the Fourteenth Amendment."), cert. denied, 518 U.S. 1033 (1996). In Hopwood, the Fifth Circuit went on to conclude that the only compelling interest to justify racial classifications was remedying past discrimination. 78 F.3d at 944. Other circuits have not resolved the issue. In Lutheran Church-Missouri Synod v. Federal Communications Comm'n, 141 F.3d 344 (D.C. Cir. 1998), the District of Columbia Circuit commented that it did "not think diversity can be elevated to the `compelling' level," id. at 354, but struck down a challenged regulation as not narrowly tailored. Id. at 356. The Seventh Circuit observed that the question of whether there may be compelling interests other than remedying past discrimination remains "unsettled." McNamara v. City of Chicago, 138 F.3d 1219, 1222 (7th Cir. 1998). The First Circuit is the only court of appeals to have addressed the issue of diversity as a compelling state interest in the context confronting us today -- the use of race-based classifications in an admissions policy in a public elementary or secondary school. Wessman v. Gittens, 160 F.3d 790, 796 (1st Cir. 1998) (assuming, without deciding, that diversity may be a compelling governmental interest).

We have never decided the question of whether diversity is a compelling interest. All of our cases cited by the Applicants are distinguishable because they concerned programs to remedy past discrimination,**7** a justification which both sides agree does not apply in the present case. Even in the remedial context, we have explicitly

_____

**7 See Alexander v. Estepp**, 95 F.3d 312, 315 (4th Cir. 1996) (holding a remedial hiring program unconstitutional); Podberesky v. Kirwan, 38 F.3d 147, 151-52 (4th Cir. 1994) (Podberesky II) (holding a remedial race-based scholarship unconstitutional); Maryland Troopers Ass'n. v. Evans, 993 F.2d 1072, 1074 (4th Cir. 1993) (holding a remedial hiring program unconstitutional).

11

avoided deciding the question of whether diversity is a compelling interest.**8**

Nor has the Supreme Court directly decided this issue. The only applicable Supreme Court precedent is Justice Powell's concurrence in Regents of Univ. of California v. Bakke, where Justice Powell wrote that diversity "furthers a compelling state interest." 438 U.S. at 313. We have interpreted Bakke as holding that the state "is not absolutely barred from giving any consideration to race" in a nonremedial context. Talbert, 648 F.2d at 928. Although no other Justice joined the diversity portion of Powell's concurrence, nothing in Bakke or subsequent Supreme Court decisions clearly forecloses the possibility that diversity may be a compelling interest.**9** Until the Supreme Court provides decisive guidance, we will assume, without so holding, that diversity may be a compelling governmental interest and proceed to examine whether the Policy is narrowly tailored to achieve diversity. Since we conclude below that the Policy was not narrowly tailored, we leave the question of whether diversity is a compelling interest

_____

**8** **See Alexander**, 95 F.3d at 316 (concluding that "even assuming, arguendo, that the asserted interests [which included, among others, diversity] are compelling, the program is not narrowly tailored . . ."); Hayes v. North State Law Enforcement Officers Ass'n , 10 F.3d 207, 213 (4th Cir. 1993) (holding that evidence presented was insufficient to survive summary judgment "[w]ithout deciding whether achieving a greater racial diversity . . . is a compelling state interest"); Podberesky v. Kirwan, 956 F.2d 52, 56 n.4 (4th Cir. 1992) (Podberesky I) ("The district court did not cite the need for diversity for this program, and it does not appear that . . . [the] Program was established with this goal in mind."). But see Talbert v. City of Richmond, 648 F.2d 925, 929 (4th Cir. 1981) (holding that the attainment of racial diversity was"a legitimate interest").

**9** The Supreme Court did not directly address either the question of whether diversity is a compelling interest or the current precedential value of Bakke in its most recent affirmative action equal protection opinion, Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995). As Justice Stevens pointed out, the "proposition that fostering diversity may provide a sufficient interest to justify such a program is not inconsistent with the Court's holding today--indeed, the question is not remotely presented in this case . . . ." Id. at 258 (Stevens, J., dissenting) (citation omitted).

unanswered. See Lying v. Northwest Indian Cemetery Prot. Ass'n, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

B.

The second question to address is whether the Policy was narrowly tailored to achieve diversity. Before we can address that question, we first must determine if we can examine the race/ethnicity factor separately from the income and language factors. The School Board argued that the race/ethnicity factor cannot be divorced from the income and first language factors. We disagree. Although the Policy is indeed composed of not one but three factors, each factor works independently of the other. We therefore limit our inquiry to the race/ethnicity factor and do not reach the income and language factors.

Examining the race/ethnicity factor, we conclude that even under Bakke it was not narrowly tailored because it relies upon racial balancing. Such nonremedial racial balancing is unconstitutional.[10]

When reviewing whether a state racial classification is narrowly tailored, we consider factors such as: "(1) the efficacy of alternative race-neutral policies, (2) the planned duration of the policy, (3) the relationship between the numerical goal and the percentage of minority group members in the relevant population or work force, (4) the

_____

[10] See Freeman v. Pitts, 503 U.S. 467, 494 (1992) ("Racial balance is not to be achieved for its own sake."); Bakke, 438 U.S. at 315 ("In a most fundamental sense the argument misconceives the nature of the state interest . . . . It is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups . . ."); Wessman, 160 F.3d at 799 ("The Policy is, at bottom, a mechanism for racial balancing--and placing our imprimatur on racial balancing risks setting a precedent that is both dangerous to our democratic ideals and almost always constitutionally forbidden."); Podberesky II, 38 F.3d at 160 ("[T]he program more resembles outright racial balancing . . . [and a]s such, it is not narrowly tailored . . .").

13

flexibility of the policy, including the provision of waivers if the goal cannot be met, and (5) the burden of the policy on innocent third parties." Hayes, 10 F.3d at 216, citing United States v. Paradise, 480 U.S. 149, 171 (1987). We acknowledge "that these factors are particularly difficult to assess where, as here, the Policy is not tied to identified past discrimination." Hayes, 10 F.3d at 216 n.8.

First, we consider whether there are alternative race-neutral policies to promote diversity. With regard to judicial policymaking in the educational context, we agree with Justice Blackmun that "the judiciary is ill-equipped and poorly trained for this." Bakke, 438 U.S. at 404 (Blackmun, J., concurring in part and dissenting in part). As Justice Blackmun noted, "The administration and management of educational institutions are beyond the competence of judges and are within the special competence of educators, provided always that the educators perform within legal and constitutional bounds." Id. Fortunately, we need not engage in judicial policymaking today because the School Board's own Alternative Schools Admission Study Committee offered one or more alternative race-neutral policies in its Report to the Superintendent.[11] While the Committee ultimately recom-

_____

[11] These three alternatives were:

>    1. Assign a small geographic area to identified alternative schools as the home school for that area, and fill the remaining spaces in the entering class by means of an unweighted random lottery from a self-selected applicant pool. The geographic area would presumably be selected so that its residents would positively effect the diversity of the school

* * *

>    2. An additional option was to have all names of an entering class in the county automatically put into the lottery. All students are then selected at random and offered admission until the class is full. Another method would be to offer randomly selected families the opportunity to have their child's name placed in a second lottery from which those students selected would be offered admission. This method would require all families, even those not interested in alternative schools, to make an active choice

* * *

14

mended the currently challenged Policy, the fact that the Committee also proposed one or more race-neutral alternatives demonstrates that the School Board has race-neutral means to promote diversity.

Second, we consider the planned duration of the Policy. The Policy states that the weighted lottery will be conducted "for the 1999-2000 school year and thereafter." Because a racial classification cannot continue in perpetuity but must have a "logical stopping point," the Policy is not narrowly tailored. City of Richmond v. Croson, 488 U.S. 469, 498 (1989).

Third, we consider the relationship between the numerical goal and the percentage of minority group members in the relevant population or work force. The Policy seeks to achieve racial and ethnic diversity in its classes "in proportions that approximate the distribution of students from [racial] groups in the district's overall student population." The means employed by the Policy to achieve such numerical racial and ethnic diversity is racial balancing.

It is clear that the Policy engages in racial balancing. The School Board attempted to distinguish its Policy by arguing that, unlike other programs where a percentage of spots is reserved solely for minorities, this program allows every applicant, regardless of race, to compete for every available spot. The School Board also argued that it was not engaging in straight racial balancing because of the deviation inherent in the lottery.

We conclude that these are distinctions without differences. Although the Policy does not explicitly set aside spots solely for certain minorities, it has practically the same result by skewing the odds of selection in favor of certain minorities. Even if the final results may have some statistical variation, what drives the entire weighted

_____

3. Each neighborhood school would be allotted a certain number of slots at each alternative school. The number of slots per school would be determined either by the percentage of that school's population relative to ATS student population or by the extent of overcrowding at the school . . . .

15

lottery process--the determination of whether it applies and the values of its weights--is racial balancing. The Policy's two goals, to provide students with the educational benefits of diversity and to help the School Board better serve the diverse groups of students in its district, do not require racial balancing.

Fourth, we consider the flexibility of the Policy. The School Board argued that the Policy was extremely flexible because instead of a set numerical goal, the final random results of the weighted lottery ultimately determined admissions. We disagree. Since ATS admissions are based on availability, if the applicant pool does not reflect the required 15% racial and ethnic diversity, each child's probability of selection in the lottery is adjusted corresponding to his or her stated race. In Bakke, Justice Powell explained that constitutionally permissible programs such as the Harvard College admissions program promote diversity by "treat[ing] each applicant as an individual in the admissions process." 438 U.S. at 318. The Policy, like the Davis admissions program in Bakke, does not treat applicants as individuals. The race/ethnicity factor grants preferential treatment to certain applicants solely because of their race.

Fifth, we consider the burden of the Policy on innocent third parties. The innocent third parties in this case are young kindergarten-age children like the Applicants who do not meet any of the Policy's diversity criteria. We find it ironic that a Policy that seeks to teach young children to view people as individuals rather than members of certain racial and ethnic groups classifies those same children as members of certain racial and ethnic groups.[12]

_____

[12] The district court concurred during the earlier Tito case:

> The court finds it both unfortunate and potentially pernicious that four year old children are directed by the state to identify themselves for admissions purposes as African American, Asian, Caucasian, [or] Hispanic . . . Although presumably the children's parents complete the applications, and most likely the children themselves do not fully understand the significance and consequences of their self-designation, it is not unreasonable to view the process as the first step in the state-sponsored perpetuation of an educational system which continues to rely upon racial dis-

16

On balance, we conclude that the Policy was not narrowly tailored to further diversity and thereby find it unconstitutional.

V.

In the alternative, the School Board argued that the district court abused its discretion with its permanent injunction. We have previously held:

> An injunction should be tailored to restrain no more than what is reasonably required to accomplish its ends .. . Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation.

Hayes, 10 F.3d at 217 (citations omitted).

In Hayes, we held that the district court's injunction, enjoining the use of racially based criteria by the City of Charlotte in its employment decisions, was overbroad. Id. We conclude that the district court's injunction in the current case suffers the same infirmity.

Although the Applicants were entitled to an injunction, they were not entitled to a permanent injunction ordering the School Board to adopt a particular admissions policy. The district court should have taken the less intrusive step of continuing to monitor and review alternative programs proposed by the School Board. Although the district court was apparently unsettled by what it characterized as the School Board's attempt "to achieve the same end that was held unconstitutional in Tito, merely by a different process," Tuttle, No. CA-98-418-

_____

> tinctions. If it is true that the Equal Protection Clause seeks ultimately to render the issue of race irrelevant in governmental decisionmaking . . ., it might not be overly utopian to begin by abandoning the insistence that young children categorize themselves according to race in a manner that will follow them throughout their education and, often, professional life.

(Citations omitted.)

17

A, at 1, there was no reason to suspect bad faith or abdication of responsibility by the School Board that might warrant such an extreme measure. The district court did not give the School Board an opportunity to explain how the new Policy was different from the one struck down in Tito. In Tito, the district court deleted a provision from the proposed order "permanently restraining [the School Board] from using race, color or ethnicity as a factor" in admissions. In so doing, the district court stated that it declined "to anticipate and foreclose any attempt by the [S]chool [B]oard to achieve by other means the goals expressed in its admissions policy." Given these facts, it is understandable that the School Board read the Tito order as not fore-closing the School Board's discretion to create a new admissions pol-icy.

Although we have held that an evidentiary hearing is not required before issuing a permanent injunction, see Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 938 (4th Cir. 1995), we conclude that the district court should have allowed an evi-dentiary hearing in this case to give the School Board an opportunity to present alternative admissions policies.

VI.

We affirm the district court's holding that the Policy was unconsti-tutional, vacate the district court's permanent injunction, and remand for an evidentiary hearing.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

18