In the Matter of ISIDORE BALABAN et al., Respondents, v. MAX J. RUBIN et al., Constituting the Board of Education of the City of New York, et al., Appellants.

Second Department, March 10, 1964.

*Leo A. Larkin, Corporation Counsel* (*Seymour B. Quel* and *Benjamin Offner* of counsel), for appellants.

*Samet, Gordon & Riseman* (*Frank H. Gordon* and *Edward Robin* of counsel), for respondents.

*Robert L. Carter, Barbara A. Morris* and *Jawn A. Sandifer* for National Association for the Advancement of Colored People, *amicus curiæ.*

BELDOCK, P. J. The principal question presented on this appeal is: Does the Board of Education of the City of New

York have the power to draw the zoning lines with respect to the attendance of children in a newly established junior high school so as to prevent segregation within that school at its inception?

Special Term held that the board had no such power and that its action was invalid because the zone thus established discriminated against petitioners' two children (and against 49 other white children) and violated section 3201 of the Education Law.

This court is of the unanimous opinion (albeit for different reasons) that Special Term was in error and that the zone as fixed by the board for the new Junior High School (J. H. S.) 275 in the Borough of Brooklyn was in all respects proper and lawful.

The opinion of the majority is that, in drawing attendance lines for a school, it is not only within the power of the board to take into consideration the ethnic composition of the children therein, but that under the decisions of the Supreme Court of the United States it is the board's responsibility so to do in order to prevent the creation of a segregated public school.

There is also involved the question whether any constitutional or statutory rights of petitioners have been violated by the zone adopted by the board for J. H. S. 275. Special Term did not reach the constitutional question. It held only that petitioners' statutory rights under section 3201 of the Education Law were violated, and for that reason it nullified the plan insofar as it included within the zone for new J. H. S. 275 the 12-block area here in dispute. Special Term rezoned the disputed area — the area in which the 51 white children reside — and placed it within the zone for J. H. S. 285, in which it previously was embraced.

The boundaries of the attendance area for the new J. H. S. 275 (which is here in dispute) were approved in March, 1963. In 1960 the board had selected the present site of J. H. S. 275 at Linden Boulevard and Rockaway Avenue. In its affidavits the board states that the site was selected in this " fringe area " in order to feed the white, the Puerto Rican and the Negro children into the new school, and thus to prevent it from becoming a " segregated school " at its very inception.

The task of formulating a zone for the new school was given initially to the Assistant Superintendent of Schools in charge of the School District involved. In February, 1962 he proposed a zone which: (a) was geographically irregular; (b) placed the school in the approximate corner of a peculiarly shaped area, remote from the zone's northern area; and (c) would result in

a school population consisting of 14% white, 52% Negro, and 34% Puerto Rican because of the residential segregation resulting from large public housing projects in the proposed zone.

When the proposed plan came before the board for action, the plan was modified by: (1) cutting off the northern area and permitting it to remain in the zone for the existing J. H. S. 263; (2) shifting the easterly boundary four blocks further to the east so as to place it midway between new J. H. S. 275 and existing J. H. S. 166; (3) shifting the southwesterly boundary *four* blocks further to the southwest so as to place it midway between new J. H. S. 275 and the existing J. H. S. 285 (located at Ralph Ave. and Beverly Rd.).

It is the shift of the southwesterly boundary which is the subject of the dipute in this case. The effect of this shift was to transfer and place within the zone for the new J. H. S. 275, the 12-block area between Rockaway Parkway and East 93rd Street, and between Church Avenue and the Bay Ridge Division of the Long Island Railroad.

In promulgating the zone for the new J. H. S. 275, the board acted in accordance with the policy which it established in 1957. Admittedly, it took into consideration *all* of the following factors: (1) distance from home to school; (2) utilization of school space; (3) convenience of transportation; (4) racial integration of the school; (5) topographic barriers; and (6) continuity of instruction.

In determining the validity of the board's zone, the following factors are considered significant:

(a) No children residing in another school zone are " bussed " into J. H. S. 275;

(b) The zone fixed for J. H. S. 275 is reasonable, normal, and regularly shaped, with the school close to the zone's approximate geographical center;

(c) Most of the children in the 12-block disputed area live closer to J. H. S. 275 than to J. H. S. 285, and no child lives further from J. H. S. 275 than from J. H. S. 285;

(d) *All* the children in the disputed area live within walking distance of J. H. S. 275;

(e) J. H. S. 275 was to be opened in September, 1963 with only seventh grade pupils;

(f) None of the 51 children here involved had ever before gone to any other junior high school;

(g) Those children living within the disputed area who were already attending another junior high school were *not* being transferred to J. H. S. 275; and

(h) The children expected to attend J. H. S. 275 as of September, 1963 would initially consist of 35.2% Negro, 33.6% Puerto Rican, and 31.2% others. This percentage division was only temporary and not fixed or rigid.

In July, 1963 the petitioners, the parents of white children living in the disputed area who were scheduled to go to J. H. S. 275 in September, 1963, instituted this proceeding under article 78 of the former Civil Practice Act, to review the board's determination fixing the zone for that new school. Petitioners alleged the violation of various constitutional and statutory rights, as well as the violation by the board of several of the criteria constituting its own zoning policy.

On the basis of the pleadings and the affidavits of the respective parties, the Special Term granted judgment in favor of petitioners and: (a) annulled the zone fixed for the new J. H. S. 275 insofar as it included the disputed 12-block area; and (b) declared such area to be within the zone of the existing J. H. S. 285. The reasoning of Special Term was substantially as follows:

(1) Racial balance was a material and compelling factor for the board's rejection of the plan first proposed by the Assistant Superintendent in charge of the district, and for its approval of the zone finally adopted for J. H. S. 275;

(2) *The deliberate inclusion of the factor of racial balance as a material basis for the board's determination renders that determination unlawful* as violative of section 3201 of the Education Law; [such section provides that: '' No person shall be refused admission into or be excluded from any public school in the state of New York on account of race, creed, color or national origin.'']

(3) Although petitioners' children had no vested right to attend J. H. S. 285 or any other particular public school, they had the statutory and moral right not to be excluded from any public school in the State by reason of their race or color;

(4) The inclusion of petitioners' children in the school zone approved for J. H. S. 275, *upon the basis of their race*, and their consequent exclusion from J. H. S. 285, their traditional neighborhood school, was violative of the language, spirit, and intent of section 3201 of the Education Law; and

(5) Therefore, it was unnecessary to reach the constitutional questions involved.

In our opinion, the determination of Special Term should be reversed and the petition dismissed upon the following grounds:

## I

The Board of Education has the statutory power to select the site for the erection of a new school (Education Law, § 2556), and to determine the school which each pupil shall attend (Education Law, § 2503, subd. 4, par. d). Consistent with the exercise of such power by the board, each child has the right to attend only the public school in the zone or district in which he resides (Education Law, § 3202, subd. 1); and in our opinion, this means the school nearest to his home.

It clearly appears that all of the 51 white children on whose behalf this proceeding was instituted live closer to or no further from J. H. S. 275 than from J. H. S. 285. Therefore, J. H. S. 275 is the school in the district of *their residence*. Only if these 51 children had been excluded from J. H. S. *275* because of their race or color, would there have been a violation of section 3201 of the Education Law.

It is true that J. H. S. 285 was the school in the district of their residence before J. H. S. 275 was built, but that was because that was the junior high school then nearest to their homes. However, when J. H. S. 275 was erected and it became the school nearest to their homes, these children were not entitled as of right to go to any other school. While section 3201 of the Education Law does read that "*No person* shall be refused admission into or be excluded from *any* public school in the state of New York on account of race, creed, color or national origin" (emphasis added), that provision can mean only that no person, on account of race, creed, color or national origin, shall be refused admission to or be excluded from any public school *to which he is entitled to go as of right*.

The argument that these children live in East Flatbush (in which J. H. S. 285 is located) and, therefore, that J. H. S. 275 (which is in Brownsville) is not a school in the district of their residence is without merit. These area names are purely artificial; there is no defined boundary line between them. Legal rights may not be found on such nebulous geographic neighborhoods.

Therefore, it is our opinion that there was no violation of section 3201 of the Education Law.

## II

The history of section 3201 of the Education Law shows that it was not violated by the zone in question.

The original statute (L. 1894, ch. 556, tit. 15, § 28) *authorized* public school authorities to establish *separate schools for Negroes*. In February, 1900 this statute was held constitutional

(*People ex rel. Cisco* v. *School Bd.*, 161 N. Y. 598) on "the separate but equal" theory.

Within two months after this decision, the Legislature (by L. 1900, ch. 492) repealed the 1894 statute. The 1900 statute provided that refusal of admission into, or exclusion from, public schools on account of "race or color" was prohibited. Present section 3201 of the Education Law is identical with the 1900 statute, except that there was added to the prohibitions "creed * * * or national origin."

It is thus conclusive from the history of section 3201 that its sole purpose was to vitiate the effect of the *Cisco* decision (*supra*) and to prevent segregation in the school system. In effect, Special Term by its determination has used section 3201 of the Education Law to permit and to foster segregation in a newly created school.

In any event, these white children were *not* excluded from the new J. H. S. 275 because of their race. The new school had to have a circumscribed attendance zone. The fact that these 51 white children were included in the reasonable geographic area fixed for the new school is the only reason they could not go to J. H. S. 285. However, the zone for J. H. S. 275 as fixed was nondiscriminatory; within the disputed 12-block area it applied alike to *all children*, whether white, Negro or Puerto Rican. Neither whites nor Negroes nor Puerto Ricans in that area could "select" to go to J. H. S. 285. The 51 children here were "excluded" from J. H. S. 285, not because of their color, but solely because they *lived* in the 12-block area which had been established as part of the zone for J. H. S. 275.

### III

It is also our opinion that the Board of Education had the right to consider the question of race or color as one of the criteria in determining the zone for the new J. H. S. 275 in order to prevent segregation, and that in so doing it violated none of the constitutional or statutory rights of these petitioners.

In the landmark case of *Brown* v. *Board of Educ.* (347 U. S. 483), minors of the Negro race sought the aid of the courts in obtaining admission to the public schools of their community. Under laws or regulations requiring or permitting segregation according to race, they had been denied admission to schools attended by white children. In holding that plaintiffs were thereby deprived of the equal protection of the laws under the Fourteenth Amendment, the court held that: (1) the opportunity of an education provided by the State is a right which must be made available to all on equal terms; (2) the segregation of

children in public schools *solely* on the basis of race, even though the physical facilities and other tangible factors may be equal, deprives children of a minority group of equal educational opportunities; (3) to segregate Negro children from others of similar age and qualifications *solely* because of their race generates a feeling of inferiority, which affects their motivation to learn and has a tendency to retard their educational and mental development; (4) separate educational facilities are inherently unequal; and (5) therefore, plaintiffs have been deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment.

On the same day that the Supreme Court decided the *Brown* case, it also held that racial segregation in public schools of the District of Columbia is a burden which constitutes an arbitrary deprivation of the liberty of Negro children in violation of the due process clause in the Fifth Amendment to the Constitution (*Bolling* v. *Sharpe*, 347 U. S. 497).

In the second *Brown* case (*Brown* v. *Board of Educ.*, 349 U. S. 294) the court remanded the matter to each of the States involved to enter such orders and decrees as would be necessary and proper to admit the parties involved to public schools on a racially nondiscriminatory basis. In so doing, the court stated that (pp. 300–301) : "the [local] courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, *revision of school districts and attendance areas* into compact units to achieve a system of determining admission to the public schools on a nonracial basis  *  *  *. They [the local courts] will also consider the adequacy of any plans the defendants may propose to meet these problems and *to effectuate a transition to a racially nondiscriminatory school system.*" (Emphasis added.)

It is important to note exactly what the Supreme Court decided in the *Brown* cases. It did not decide that the States *must* mix persons of different races in the schools. What it decided was that a State by affirmative action may not deny to any person on account of race the right to attend any school which the State maintains; it prohibited affirmative discrimination; and it proscribed the use of all governmental power to enforce segregation. In other words, the Constitution does not require integration. It merely forbids discrimination (*Avery* v. *Wichita Falls Ind. School Dist.*, 241 F. 2d 230; *Borders* v. *Rippy*, 247 F. 2d 268; *Shuttlesworth* v. *Birmingham Bd. of Educ.*, 162 F. Supp. 372, affd. 358 U. S. 101).

Therefore, the desegregation required by the Constitution, as interpreted by the *Brown* cases, does *not* mean that there *must* be an intermingling of the races in all school districts. It does *not* mean that, regardless of school zones or the residence of Negro or white students, there is an absolute, affirmative duty on the part of every Board of Education to integrate the races so as to bring about, as nearly as possible, racial balance in *each* of the schools under its supervision. *It does not mean, for example, that white children who live in noncontiguous or outlying areas must be "bussed" into a Negro area in order to desegregate a Negro school.* A school system developed on the neighborhood school plan, honestly and conscientiously constructed, with no intention or purpose to segregate the races, need not be destroyed or abandoned because the resulting effect is to have a racial imbalance in certain schools where the district is populated almost entirely by Negroes or whites.

However, the fact that integration is not compelled by the Federal Constitution or by the *Brown* cases does not mean that integration is prohibited or not permitted. Boundary lines for attendance at a new school must be fixed somewhere. A zone for a new school must necessarily take away part of the zone or zones theretofore established for already existing schools. The controlling question here is whether a Board of Education, in selecting a site for a new school and in thereafter establishing the geographic zone for the new school, is barred from considering, among others, racial or ethnic factors in order to prevent the establishment of a racially segregated school.

A similar problem was presented in California, where the court stated: "Although in general the federal cases have been concerned with instances of complete or almost complete segregation, it is not decisive that absolute segregation is not present. Improper discrimination may exist notwithstanding attendance by some white children at a predominantly Negro school or attendance by some Negro children at a predominantly white school" (*Jackson* v. *Pasadena City School Dist.*, 31 Cal. Rptr. 606–609).

In our opinion, in the second *Brown* case (349 U. S. 294, 300–301) when the Supreme Court stated that "the courts may consider problems related to * * * *revision of school districts* and attendance areas into compact units to achieve a system of determining admission to the public schools *on a nonracial basis*" it meant that one of the ways in which desegregation should be carried out was within the framework of "school districts and attendance areas" and that this

language constituted direct authority for a Board of Education to take into consideration race as one of the factors in the delineation of a school zone.

Both *Taylor* v. *Board of Educ.* (191 F. Supp. 181, affd. 294 F. 2d 36, cert. den. 368 U. S. 940) and *Clemons* v. *Board of Educ.* (228 F. 2d 853, cert. den. 350 U. S. 1006) are clear determinations that, for the purpose of desegregation, zoning *must* take into account racial factors in the surrounding area in order to achieve the required desegregation. There is no other way desegregation can be accomplished. [It is interesting to note that the *Clemons* determination was made with respect to schools in Ohio, which has a statute similar to our section 3201 of the Education Law; and that the *Taylor* determination was with respect to schools in New York State.] Where a school zone is artificially gerrymandered to achieve and maintain a segregated Negro school, as in *Taylor* and *Clemons,* if the school is thereafter desegregated by revision of school districts and attendance areas, as the Supreme Court suggested in the second *Brown* case, that can mean only that the school zones may be established and altered so as to prevent segregation before its creation.

The decisions of the United States Supreme Court in the *Brown* cases constitute a clear mandate to the Boards of Education, in selecting the site for a new school and in establishing its attendance zone, to act affirmatively in a manner which will prevent *de facto* segregation in such new school. This is precisely what the board here did with respect to J. H. S. 275. By thus complying with the constitutional mandate, the board did not violate any constitutional or other right of these petitioners. On the contrary, it performed its duty in such a way as to safeguard the rights of *all* the children scheduled to attend the school; and it did so without discrimination and without regard to their race, color, creed, or national origin.

In California the State Board of Education several years ago adopted a policy that, in determining school zones, the ethnic composition of the area should be considered to avoid and eliminate segregation of children on account of race or color. That policy was approved in *Jackson* v. *Pasadena City School Dist.* (31 Cal. Rptr. 606, 609–610). The court there stated: " A racial imbalance may be created or intensified in a particular school not only by requiring Negroes to attend it but also by providing different schools for white students who, because of proximity or convenience, would be required to attend it if boundaries were fixed on a nonracial basis. * * * School authorities, of course, are not required to attain an exact appor-

tionment of Negroes among the schools, and consideration must be given to the various factors in each case, including the practical necessities of governmental operation. For example, consideration should be given, on the one hand, to the degree of racial imbalance in the particular school * * * and, on the other hand, to such matters as the difficulty and effectiveness of revising school boundaries so as to eliminate segregation and the availability of other facilities to which students can be transferred.''

It is also our opinion that, in any event, if section 3201 of the Education Law can be utilized to defeat efforts to desegregate schools, then, in the light of the *Brown* decisions by the Supreme Court, that statute would have to be declared unconstitutional.

## IV

It should be emphasized, however, that in addition to the racial criterion, all the other five criteria utilized by the board furnish ample support for the zone fixed by it for the new J. H. S. 275. An examination of the school boundary lines in the light of the other criteria, such as easy access from all parts of the zone (including the area where the 51 white children live); the central location of the school within the zone; the density of the population, etc., shows that the zone was determined in a most reasonable nondiscriminatory way, that is, with due regard for the safety, the convenience and the better education of all the children residing in the zone, and without regard to race or color.

The argument that the board did not take into consideration two of the six factors which it always uses for zoning, namely, that of topographical barriers and utilization of school space, is completely unfounded. There are no topographical barriers. The present under-utilization of J. H. S. 275 comes about only because the board did not want to transfer presently to J. H. S. 275 the children in the seventh, eighth and ninth grades, who were attending other schools. In the course of the next two school years, when all the grades will have been established for J. H. S. 275, there will be no under-utilization.

## V

Petitioners' argument that J. H. S. 275 was zoned to establish a racial quota is wholly untenable. Indeed, it is conceded that a quota system is repugnant and illegal; but there was no quota system in the case at bar.

All that the officials of the board stated is that in September, 1963 the ethnic composition of J. H. S. 275 was expected to be

35.2% Negro, 33.6% Puerto Rican, and 31.2% white. A quota system is the establishment of a fixed immutable ratio in order to achieve and thereafter to *maintain and preserve* the same racial composition. That is not the intent here. Once the geographic boundaries (or zone) for attendance at J. H. S. 275 are prescribed, every child residing in that zone, if he has the necessary educational qualifications, may go to that junior high school, regardless of race or color and without any limitation as to percentage or number of qualified pupils of his own or of any other race or color. In actual operation, it is impossible to maintain and preserve the original ethnic composition, and there never was any intent to do so. In our opinion, the quota issue raised by petitioners is intended merely to give a semblance of illegality to the zone as fixed by the board.

## VI

That the zone established by the board did not violate section 40 of the Civil Rights Law is clear. None of the rights or privileges of these 51 white children will be denied to them if they attend J. H. S. 275; they will have the same rights or privileges accorded to all other children in that school.

## CONCLUSION

The difficulties in resolving problems created by cases such as the one at bar were highlighted by the Supreme Court of the United States when it stated that: " Only those lacking responsible humility will have a confident solution for problems as intractable as the frictions attributable to differences of race, color or religion " (*Beauharnais* v. *Illinois,* 343 U. S. 250, 262).

In the exercise of a reasonable discretion, the Board of Education has the power to establish school attendance zones; to determine the area that a particular school shall serve; and to require the students in that area to attend that school. Of course, the general powers of the board with respect to attendance zones are subject to the constitutional guarantees of equal protection and due process.

It is our opinion that the board here not only attempted to solve a difficult question in what we consider a very reasonable manner, but that it violated no constitutional or statutory right of these petitioners in so doing. It complied reasonably with the mandate of the *Brown* cases (*supra*) to zone J. H. S. 275 so that it would be a desegregated school. The zone is regular and normal; the school is placed in the approximate geographic center of the zone; most, if not all of the children in the disputed 12-block area live closer to J. H. S. 275 than to

J. H. S. 285; and all of them live within walking distance of J. H. S. 275.

Obviously, these children cannot be given their choice of schools. The choice of schools must be left to the sound discretion of the board; otherwise there would be chaos in the administration of the school system.

The judgment appealed from should be reversed on the law, without costs, and the petition should be dismissed. The findings of fact implicit in the decision of the Special Term should be affirmed.

CHRIST and BRENNAN, JJ. (concurring in the result). By the application of every standard available to the Board of Education in its placement of children in the schools of the City of New York, its action here has been reasonable and within the limits of sound discretion. We do not find this school zoning to have been forced solely by racial considerations. The children will be required to attend a nearby school which has adequate accommodations. If race and color are disregarded, other considerations point irrevocably to the placement of the children in the very school which the board has selected.

It is unnecessary to this decision to consider the right of the Board of Education to inquire into the race or color of the children.

KLEINFELD and HILL, JJ., concur with BELDOCK, P. J.; CHRIST and BRENNAN, JJ., concur in the result with a separate memorandum.

Judgment reversed on the law, without costs, and petition dismissed. The findings of fact implicit in the decision of the Special Term are affirmed.