Robert L. DOWELL, an infant, who sues by A. L. Dowell, his father and next of friend, Plaintiff,

v.

The SCHOOL BOARD OF OKLAHOMA CITY PUBLIC SCHOOLS et al., Defendants.

Civ. No. 9452.

United States District Court
W. D. Oklahoma.

Sept. 7, 1965.

U. Simpson Tate, Wewoka, Okl., Jack Greenberg, Derrick A. Bell, Jr., New York City, for plaintiff.

Coleman Hayes, Oklahoma City, Okl., for defendants.

BOHANON, District Judge.

This is a class action to test the sufficiency as to law and desegregation action of the Oklahoma City Board of Education "Policy Statement Regarding Integration of the Oklahoma City Public Schools," which was filed with the Court January, 1964, in compliance with the Court's Opinion of July, 1963 (219 F. Supp. 427). With the filing of the Policy Statement, counsel for the School Board filed its Motion requesting the Court to set the Policy Statement for hearing. Thereafter a hearing was had upon the Policy Statement, and at the hearing the evidence was substantially the same as had been offered to the Court prior to the Opinion of July, 1963.

The crux of the problem before the Court is whether or not the Policy Statement is sufficient in law to comply with the Court's Opinion of July 11, 1963, in many respects, particularly insofar as it pertains to paragraph 6 and paragraph 8 thereof, and the case of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, and other cases of the same tenor.

Following the first hearing on the Policy Statement regarding integration of the Oklahoma City Public Schools above referred to, the Court was without sufficient evidence to approve or disapprove the Policy Statement, and for this reason requested the Oklahoma City Board of Education to employ experts who were competent, qualified, unbiased, unprejudiced, and independent of any local sentiment, to make a survey of the problem as it related to the integration of the Oklahoma City Public Schools, for the benefit of the Court as well as the Oklahoma City Board of Education and the Oklahoma City School System. The School Board rejected this request. Thereafter the Court invited the plaintiff to cause such a report to be made, and in due time the plaintiff responded favorably to the Court's suggestion, and the Court entered an Order authorizing and directing Dr. William R. Carmack, then director of the Southwest Center for Human Relations Studies, The University of Oklahoma, Norman, Oklahoma; Dr. Willard B. Spalding, Assistant Director, Coordinating Council for Higher Education for the State of California, San Francisco, California; and Dr. Earl A. McGovern, Administrative Assistant for Research and Evaluation to the Superintendent of New Rochelle Schools, New Rochelle, New York, to make such investigation, study, and report, and file the same with the Court. The report was completed and filed January, 1965. In March, 1965, plaintiff filed its motion for an order requiring the defendant School Board to submit a desegregation plan with special emphasis on school zone lines, pupil assignments, transfers, faculty integration, in-service education of faculty, and calling for the plan of integration to be put on a fixed time of performance.

Each of the three experts is, by training and experience, well qualified to accomplish the study of the Oklahoma City School System. Dr. Spalding is one of the outstanding names in education in the country, with wide experience in public school administration, including experience as Superintendent of School Systems in Massachusetts, New Jersey, and Oregon. He is a former dean of the College of Education of The University of Illinois and Chairman of the Division of Education of Portland State College. He has co-authored several books on education, including "The Public Administration of American Schools," and has authored many articles in the field of education. Dr. McGovern has been involved in school administration since 1955 and has played a leading role in solving integration problems in the school system of New Rochelle, New York. Dr. Carmack, a scholar, offered his expert services and the facilities of the Human Relations Center which he established at The University of Oklahoma, for the purpose of compiling and organizing the great mass of data used by the experts in compiling the report.

In January, 1965, after the expenditure of several hundred hours of work and at least two three-day visits to Oklahoma City, the above-named experts filed with the Court their report entitled "Integration of the Public Schools of Oklahoma City." The Report analyzes statistical data on schools, pupils and faculty, reviews in great detail the present status of integration of the Oklahoma City Public Schools, finds that some progress has been made in the integration of students and faculties, but concludes that the absence of an affirmative program and the maintenance of transfer policies which enable white pupils to transfer from predominantly Negro schools to predominantly white schools has greatly hindered the disestablishment of segregation in the public school system. The

Report notes that teacher desegregation has taken place on only a token basis, makes several recommendations aimed at both correcting existing policies which hinder desegregation and permitting at least a meaningful beginning toward the desegregation of the school system required by the mandate of the Brown decisions.

After careful study and evaluation of the Report admitted in evidence, hearing the testimony of the experts who prepared it, observing their demeanor, and noting their responses to questions posed by counsel for defendants, this Court concludes the Report was prepared by highly qualified individuals in an atmosphere of objective impartiality; that the statistics and data upon which the recommendations are based are substantially accurate, and that the recommended remedies for the continuing segregation of the defendant school system are reasonable, workable, and educationally sound. That the recommendations, if placed into effect by the Board with the same spirit in which they were made, will substantially increase the quality of the education for all pupils in the Oklahoma public schools, both white and Negro.

The Court hereby adopts and includes the Report by reference as a part of this Opinion, and the Appendix attached thereto.

Hearing on the Report was scheduled for April 12, 1965, but various difficulties, including the lengthy illness of one of the educational experts, delayed proceedings until August 9, 1965. At the hearing, extensive testimony was given by the three educational experts. In addition, plaintiff offered the testimony of Henry Floyd, a Negro licensed real estate broker, and Dr. Chester Pierce, a Negro psychiatrist from The University of Oklahoma School of Medicine. The School Board obtained testimony from former board member Phil C. Bennett and Superintendent of Schools Jack F. Parker.

The School Board has instituted the changes in its policy and administration required by this Court's Order of July, 1963, and has in good faith attempted to administer the school system in accordance with these changes.

The Board has adopted a special transfer policy, the provisions of which are adequately set forth in both the Integration Report and in answers to interrogatories filed by defendants. Under this transfer policy, parents of white pupils assigned to integrated or predominantly Negro schools, are able to utilize its provisions in order to obtain transfers out of such schools and into all white schools or to integrated schools where the percentage of Negro pupils is not large. In 1963–64, 86%, and in 1964–65, 90% of the approved transfers were granted to white pupils.

Certain provisions of the special transfer policy, including, but not limited to, the provision permitting transfer to make it possible for two or more members of the same family to attend the same school, the provision allowing a pupil to complete the highest grade in a school which he has been attending, and the provision permitting transfer for valid, good faith reasons, give a continuing effect to the "minority to majority" transfer rule invalidated in this Court's July, 1963, Opinion. Under the provisions set forth above, pupils who obtained transfers away from their neighborhood schools to segregated schools under the "minority to majority" transfer policy are not only permitted to remain in such schools, but also provide a basis for enabling all brothers and sisters to follow them from the schools near their residences to segregated schools.

The Board is aware of the purpose for which some white parents have sought transfers under this policy, and notes some measures taken to tighten the transfer policy and reduce the number of pupils permitted to leave their "neighborhood schools." Such measures, to date, have not been wholly successful. For example, virtually all of the 20 to 30 white pupils assigned to the predominantly Negro Lincoln Elementary School were permitted to transfer to white schools.

The special transfer policy as presently administered tends to permit transfers for reasons no different or more valid than those obtained under the now voided "minority to majority" transfer rule. Such policy tends to perpetuate a segregated system, violates the Board's asserted belief in the philosophy of the neighborhood school system and, for several economic and sociological reasons, deprives Negro pupils assigned to predominantly Negro schools who are less able to obtain such transfers, of the opportunity to obtain a desegregated education.

The Court noted in its July, 1963, Opinion that Negroes in Oklahoma City reside in certain definite areas, which areas were designated as such originally by virtue of state law and were continued through the general use of restrictive covenants. Such legal restrictions are no longer valid, but the testimony shows that discrimination by some realtors and financial institutions renders it extremely difficult for Negroes to find housing in areas where no Negroes are presently residing. This Court takes judicial notice that there is resistance in all-white communities to Negroes who seek to obtain housing there. The Court also takes judicial notice of its own recent decision in Anderson v. Town of Forest Park, D.C.Oklahoma, 239 F.Supp. 576, Order and Opinion filed March 24, 1965, in which ordinances requiring highly discriminatory building regulations were declared invalid based on findings that such ordinances were enacted to discourage Negroes from building homes in the Forest Park area, which is adjacent to and inside the corporate limits of Oklahoma City. In addition, this Court takes judicial notice of the continuing subordinate position Negroes hold on the economic ladder. All of the above factors contribute to Negroes' inability to exercise a substantial freedom of choice in determining their place of residence. As a result of segregated residential patterns, and, of course, the laws and policies requiring school segregation, several schools in the defendants' system have traditionally been Negro schools.[1]

When the Board prepared uniracial zone lines following the Brown decision, these schools remained virtually 100% Negro. Pupils assigned to those schools continued to suffer the same denial of an equal education and the same psychological and constitutional harm as set forth in the Brown opinion and repeated in the testimony received in this case. As a result, while 12,503, or 16.9% of the almost 74,000 pupils in the system are non-white, all but 21 of the system's 107 schools were either all-white or all-Negro during the 1964–65 school year. More important, when the number of schools with at least 95% white pupils or 95% non-white pupils is eliminated, the number of integrated schools is reduced from 21 to 12.

The Board maintains that it has no affirmative duty to adopt policies that would increase the percentage of pupils who are obtaining a desegregated education. But a school system does not remain static, and the failure to adopt an affirmative policy is itself a policy, adherence to which, at least in this case, has slowed up—in some cases—reversed the desegregation process. For example, the Report and testimony show there are 13 elementary schools housing pupils in 1964–65 that didn't house pupils in 1959–60. Of these, 9 were all white, 2 were all Negro, one was 99% white and one was 99% Negro. Nine new schools are presently planned or under construction, of which all but one will serve all-white or virtually all-white school zones. Signifi-

1. The Court's finding with regard to the residential segregation problem in Oklahoma City squares with studies of ghetto confinement of Negroes elsewhere in the Nation. See Peters, Civil Rights and State Non-Action, 33 Notre Dame Law 303 (1959); McEntire, Residence and Race, 67 (1960); Miller, Government's Responsibility for Residential Segregation, in Race and Property 58 (1964); United States Commission on Race and Housing, Where Shall We Live? 29–34 (1958). Vose, Caucasions Only 1–28 (1959).

cantly, only a technical-vocational school serving the whole city is expected to be integrated.

At the conclusion of the 1964–65 school year, there was little faculty desegregation in the Oklahoma City public schools. Of the 107 schools in the system, only 12 had integrated faculties, and these occurred in schools where both white and Negro pupils were attending. Negro faculty personnel, who comprise about 14% of the total, were generally assigned exclusively to all-Negro schools, and white faculty personnel were generally assigned solely to all-white schools.

For the 1965–66 school year the Board has announced its intention to assign five Negro teachers to schools where no Negro pupils are assigned, and at least one white teacher to all-Negro schools. This is a move in the right direction, but at this rate it will take at least 10 years to provide even a fair, not good, faculty integration in all of Oklahoma City's schools. The Board cannot leave the employment of Negro teachers to the pleasure of School Superintendent but must assume its duty and direct to what schools teachers shall be assigned.

■ Reviewing all the Board's policies with regard to school desegregation, including its desegregation plan filed in January, 1964, and the testimony concerning the implementation of that plan in the context of the present racial make-up of the school system both as to pupils and faculty, this Court concludes that the Board has failed to desegregate the public schools in a manner so as to eliminate either the tangible elements of the segregated system, or the violation of the constitutional rights of the plaintiffs and the members of their class, enumerated in the Brown decision.

The essential or most important point is that defendants have never prepared a plan by which progress in the desegregation process could be accurately judged either by themselves or by others. The plan submitted to this Court in January, 1964, is not a plan, but a statement of policy. School desegregation is a difficult and complicated matter, and, as the record shows, cannot be accomplished by a statement of policy.

Desegregation of public schools in a system as large as Oklahoma City requires a definite and positive plan providing definable and ascertainable goals to be achieved within a definite time according to a prepared procedure and with responsibilities clearly designated.

The Board's goal to provide "the best possible educational program for every pupil for whom it has responsibility" cannot be attained unless the segregated system, deeply imbedded in every aspect of the school program, is completely erased. Efficient eradiction will require consideration and action based on race, color, national origin and economic circumstances since all of these factors, if ignored, both tend to perpetuate in fact the racial difference so long required by law, and place beyond attainment the Board's goal of equal educational opportunity for all.

The Board's desegregation plan professes adherence to a neighborhood school policy based on "logically consistent geographical areas." But such a policy, when superimposed over already existing residential segregation initiated by law in Oklahoma City, leads inexorably to continued school segregation. This result follows because: (a) Negro pupils residing in all Negro areas are locked into Negro schools which traditionally have served such areas. The existence of such schools and neighborhoods is neither accidental nor fortuitous, but the result of laws requiring segregation in housing and education; and (b) integrated areas and schools are destroyed because uncorrected racial restrictions in the housing field enable whites to move to areas served by all white or virtually all white schools, secure in the knowledge that housing segregation and the neighborhood school policy will not enable Negroes to follow them. These very factors are destroying the integrated character of such schools as Northeast High School, and the Harmony, Polk, Longfellow and Riverside elementary schools. The Integration Report

concludes, and correctly this Court holds, that inflexible adherence to the neighborhood school policy in making initial assignments serves to maintain and extend school segregation by extending areas of all Negro housing, destroying in the process already integrated neighborhoods and thereby increasing the number of segregated schools.

The history of the Oklahoma school system reveals that the Board's commitment to a neighborhood school policy has been considerably less than total. During the period when the schools were operated on a completely segregated basis, state laws and board policies required that all pupils attend a school serving their race which necessitated pupils bypassing schools located near their residences and traveling considerable distances to attend schools in conformance with the racial patterns. After the Brown decision and the Board's abandonment of its dual zone policy, a minority to majority transfer rule was placed in effect, the express purpose of which was to enable pupils to transfer from the schools located nearest their residences, i. e., the neighborhood school, in order to enroll in schools traditionally serving pupils of their race, and located outside their immediate neighborhood. As indicated above, current school transfer policies give continued vitality to this now invalidated provision. Transfer policies now in effect enabled 1035 pupils in 1963–64 and at least 834 pupils in 1964–65 to obtain transfers to schools other than those in their neighborhoods. Thus, it appears that the neighborhood school concept has been in the past, and continues in the present to be expendable when segregation is at stake.

The existence of segregated residential patterns make necessary, at the very least, a transfer policy which enables pupils to transfer to schools outside the school of their residence where the majority of pupils are of a different race or color.

For the same reasons, it is imminently desirable that all faculty personnel be employed, assigned, and promoted with regard to both their quality of preparation and performance and in a manner so as to insure that each school, whether located in a segregated residential area or not, shall have a faculty representative of all racial groups in the total community.

The recommendations contained in the Integration Report will permit a meaningful start to the eradication of the inequalities, based on race, still existing in the defendant school system:

A. The "majority to minority" transfer plan will enable all pupils assigned to schools where their race predominates (more than 50%) to obtain transfer, for that reason, space permitting, to schools where their race is in the minority (less than 50%). This policy enables Negro children trapped in Negro neighborhoods by former school segregation policies and current residential patterns to transfer from predominantly Negro schools to schools where they can attain an integrated education. The undisputed testimony in this case indicates that such transfers will provide an improved education for both Negroes and whites and will not be any more damaging to the neighborhood school concept than are several provisions of the Board's transfer policy now being used to maintain segregation.

B. The recommendation that the zone lines of the integrated Northeast and all-white Harding High Schools and the integrated Central and all-white Classen High Schools be combined provides a further method of overcoming the results of residential segregation which, because of the Board's inaction, has resulted in the maintenance of schools based on race. The combining of the zones as suggested in the Report and testimony (with the Board to determine which school in each set is to be used for grades 7–9 and which school is to be used for grades 10–12) is reasonable and educationally sound. It will require pupils to travel no greater distance than many are presently traveling to reach schools at the secondary level.

C. Faculty integration should adhere to ascertainable standards and a recom-

mendation contained in the Integration Report setting a goal of 1970 by which time there should be the same approximate percentage of non-white teachers in each school as there now is in the system seems a reasonable and workable standard, providing as it does for stability in school faculties during the integration process, and keying the change to personnel turnover figures indicating that approximately 15% of the total faculty is replaced each year. Thus, faculty integration may be accomplished by replacements to the faculty as well as by transfers. The assignment of teachers is a prime duty of the Board and will not be delegated to school principals to wholly select its teachers except under the above-expressed provisions.

D. The chances for successful desegregation depend in substantial part on providing adequate knowledge, understanding, and preparation for such change to those who are to be responsible for it. For this reason, the Court finds that the recommendations contained in the Integration Report on in-service education of faculty provide an excellent method by which to insure that the desegregation process can be operated as smoothly and efficiently as possible. See Title 42 U.S.C. § 2000c-3 and 4.

The Court holds that the recommendations contained in the Integration Report and testimony are designed, are intended, and will assist in the disestablishment of the segregated school system originally created by law and maintained by residential patterns which themselves are the product of governmental action. Such recommendations are no less valid for this purpose because of their similarity to remedies put forth as correctives of racial inequity resulting from entirely fortuitous circumstances.

Compliance with the Supreme Court's Brown decision will not be obtained in Oklahoma City by inaction. Continuing racial discrimination in housing and in economic opportunities, combined with still viable public adherence to the standards of a segregated society, render impossible meaningful school desegregation unless vigorous, affirmative measures are undertaken by the School Board. Such changes must be instituted with full regard rather than disregard of race.

While the full implications of the Supreme Court's decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), remain uncertain, this Court concludes that the action thus far taken by the defendant School Board falls far short of providing the desegregated education envisioned in the Brown opinion as the constitutional right of plaintiffs and the class they represent.

The Supreme Court's second opinion in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) provided that the school desegregation process could be accomplished over a period of time to permit the elimination of administrative obstacles in a systematic and effective manner. The burden of going forward with desegregation was placed on the school boards, but the responsibility for reviewing the adequacy of desegregation and good faith compliance at the earliest practicable date, was placed on the Federal Courts, which were admonished to consider " * * * the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially non-discriminatory school system." The defendant Board, to comply with the Brown decisions, must thus have a plan which sets forth the steps to be taken to effectuate the transition to a school system not based on race, but based on good will.

Paper compliance and policy statements are insufficient to satisfy the standards of desegregation required by the second Brown decision. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5, and Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632, make this perfectly clear, and where the cessation of assignment and transfer policies based solely on race is insufficient to bring about more than token change in the segregated system, the Board must devise affirmative action rea-

sonably purposed to effectuate the desegregation goal. This conclusion makes no new law:

(a) In Downs v. Board of Education of Kansas City, Kansas, 336 F.2d 988, 989, 995 (10 Cir. 1964), the Court found that the neighborhood school system is not objectionable on constitutional grounds " * * * in the absence of a showing that such school systems are being used to deprive a student of his constitutional rights, * * * " but reported that:

> "They have been successfully challenged on constitutional grounds where operated in such a way as to discriminate against students because of their race or color. E. G., Norwood v. Tucker, 8 Cir., 287 F.2d 798; Northcross v. Board of Education of City of Memphis, 6 Cir., 302 F.2d 818, cert. denied, 370 U.S. 944, 82 S.Ct. 1586, 8 L.Ed.2d 810; Green v. School Board of City of Roanoke, Virginia, 4 Cir., 304 F.2d 118; Dodson v. School Board of City of Charlottesville, 4 Cir., 289 F.2d 439; Jones v. School Board of City of Alexandria, Virginia, 4 Cir., 278 F. 2d 72."

█ (b) Similarly, the Eighth Circuit in Dove v. Parham, 282 F.2d 256 (8 Cir. 1960) has affirmed that educational principles and theories may not be used to prevent the vindication of constitutional rights if they result in the preservation of an existing system of imposed segregation.

> "In summary, it is our view that the obligation of a school district to disestablish a system of imposed segregation, as the correcting of a constitutional violation, cannot be said to have been met by a process of applying placement standards, educational theories, or other criteria, which produce the result of leaving the previous racial situation existing, just as before. Such an absolute result affords no basis to contend that the imposed segregation has been or is being eliminated. If placement standards, educational theories, or other criteria used have the effect in application of preserving a created status of constitutional violation, then they fail to constitute a sufficient remedy for dealing with the constitutional wrong.

> "Whatever may be the right of these things to dominate student location in a school system where the general status of constitutional violation does not exist, they do not have a supremacy to leave standing a situation of such violation, no matter what educational justification they may provide, or with what subjective good faith they may have been employed."

(c) It is for this reason that the Fifth Circuit in Ross v. Dyer, 312 F.2d 191, 196 (1963) found that a rule of long standing (requiring that a newly enrolled pupil be assigned to the school where his older brothers or sisters were sent) even if applied in the same way to Negroes and whites and not overtly predicated on race, violates the Fourteenth Amendment if " * * * in the transition from a segregated to a desegregated school system," such a rule prevents Negro children from achieving constitutional rights.

(d) The Fourth Circuit, in Brooks v. County School Board of Arlington, Virginia, 324 F.2d 303, 308 (1963) found that where a Negro school zone was an enclave surrounded by white school zones " * * * [T]he process of transition from segregation to desegregation is not yet finished."

(e) The Seventh Circuit, in Bell v. School City of Gary, Indiana, 324 F.2d 209 (1963), while refusing to find in the Record before it that the Board was under an affirmative constitutional duty to end de facto segregation, held that attendance zones to be upheld must have been honestly and conscientiously constructed with no intention or purpose to segregate the races.

(f) The Sixth Circuit, in Northcross v. Board of Education of City of Memphis, 333 F.2d 661, reviewed evidence that school zone lines had been drawn so as to

preserve a maximum amount of segregation and held that:

"Where challenged the burden of proof is on the Board to demonstrate that the zone lines of each school were not drawn with a view to preserve a maximum amount of segregation. Where the Board is under compulsion to desegregate the schools (1st Brown case, Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873) we do not think that drawing zone lines in such a manner as to disturb the people as little as possible is a proper factor in rezoning the schools. 333 F.2d at 664."

See also Clemons v. Board of Education of Hillsborough, Ohio, 228 F.2d 853 (6 Cir. 1956).

(g) The Third Circuit, in Evans v. Ennis, 281 F.2d 385, 394 (1960), cert. denied, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed. 2d 365, did not question the good faith of the Board, but pointed out that " * * good faith alone cannot solve their problem or our own. True the defendants must act in good faith to comply with the mandate of the Supreme Court, but they must do more than this. They must proceed to integration with all deliberate speed."

(h) The Second Circuit, in Taylor v. Board of Education of City School Dist. of New Rochelle, 191 F.Supp. 181, 192 (S.D.N.Y.1961); 195 F.Supp. 231 (S.D. N.Y.1961), affirmed 294 F.2d 36 (2nd Cir. 1961), when faced with evidence of zoning which created racial segregation, affirmed the District Court order to desegregate. The District Court held at 191 F.Supp. 192:

" * * * I see no basis to draw a distinction, legal or moral, between segregation established by the formality of a dual system of education, as in Brown, and that created by

gerrymandering of school district lines and transferring of white children as in the instant case. Cf. Gomillion v. Lightfoot, supra (364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110). The result is the same in each case; the conduct of responsible school officials has operated to deny the Negro children the opportunities for a full and meaningful educational experience guaranteed to them by the Fourteenth Amendment."

▆▆▆▆ The validity of defendant Board's action in rezoning its public schools must be judged not only in the light of the result (more than 90% of the system's schools remained virtually all Negro or all white), but also with regard to the residential patterns in Oklahoma City, established by statute, and by restrictive covenant, and maintained at present by various discriminatory customs and practices which effectively limit the area where Negroes live to easily definable areas. To draw school zone lines without regard to these residential patterns is to continue the very segregation which necessitated the rezoning action, and requires judicial condemnation of the procedure. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. The Fifth Circuit in Holland v. Board of Public Instruction, 258 F.2d 730, 732 (1958) found a violation of the Fourteenth Amendment where school attendance boundaries corresponded with the boundaries of Negro residential areas segregated by city ordinance. While purported to relate to residence and not race, the Court found that the board of education was taking advantage of housing segregation to maintain school segregation.

▆▆▆ Reviewed in the context of these holdings, the recommendations contained in the Integration Report and testimony are not only educationally sound, but legally appropriate.[2] This case does not

---

**2.** This conclusion follows despite the similarity of the recommendations to remedies advocated for the correction of problems of racial imbalance. Wright, De Facto Segregation in Public Schools, 40

N.Y.U. Law Rev. 285 (Apr. 1965); Carter, De Facto School Segregation—An Examination of the Legal and Constitutional Questions Presented, 16 Western Res.L.Rev. 502 (May 1965); Fiss, Racial

raise issues regarding a school board's constitutional duty to correct racial imbalance in localities where there is no prior history of segregation, or where prior racial policies are deemed corrected. Compare Balaban v. Rubin, 40 Misc.2d 249, 242 N.Y.S.2d 973 (Sup.Ct. 1963), rev'd, 20 A.D.2d 438, 248 N.Y.S.2d 574 (2d Dept.), aff'd, 14 N.Y.2d 193, 250 N.Y.S.2d 281, 199 N.E.2d 375 (1964), cert. denied, 379 U.S. 881, 85 S.Ct. 148, 13 L.Ed.2d 87 (1964); Morean v. Board of Education of Town of Montclair, 42 N.J. 237, 200 A.2d 97 (1964); Jackson v. Pasadena City School District, 59 Cal. 2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963); Blocker v. Board of Education of Manhasset, 226 F.Supp. 208 (E.D.N.Y. 1964); Branche v. Board of Education of Town of Hempstead, 204 F.Supp. 150 (E.D.N.Y.1962) with Barksdale v. Springfield School Comm., 237 F.Supp. 543 (D.Mass.1965), rev'd. 348 F.2d 261 (1st Cir., July 12, 1965); Bell v. School City of Gary, Indiana, 213 F.Supp. 819 (N.D.Ind.1963), aff'd, 324 F.2d 209 (7th Cir. 1963), cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964); Downs v. Board of Education of Kansas City, Kansas, 336 F.2d 988 (10 Cir. 1964), cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965); Gilliam v. School Board of City of Hopewell, Virginia, 345 F.2d 325 (4 Cir. 1965).[3] The duty to disestablish segregation is clear in situations such as Oklahoma City, where such school segregation policies were in force and their effects have not been corrected.

Thus, this case is distinguishable from Downs v. Board of Education of Kansas City, Kansas, 10 Cir., 336 F.2d 988 (1964) where the District Court found the Kansas City Board had effectively desegregated its school system, had not gerrymandered zone lines, and was under no constitutional duty to take further action to balance the racial population in each school. This Court, based on its continuing contact with this case for almost four years, concludes that the defendant Board has failed to eliminate the major elements of a segregated school system, and thereby continued to inflict both the educational and psychological harm on plaintiffs and the members of their class which the Supreme Court in the Brown case found a violation of their constitutional rights.

Clearly, defendants may consider race in disestablishing their segregated schools without violating the Fourteenth Amendment's equal protection clause. The admonition of the first Mr. Justice Harlan in his dissenting opinion in Plessy v. Ferguson, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) that "Our Constitution is color-blind" was directed against the "separate but equal" doctrine, and its rejection in Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873, was an explicit recognition that separate educational facilities are inherently unequal, and did not convert Justice Harlan's metaphor into constitutional dogma barring affirmative action to accomplish the purposes of the Fourteenth Amendment. Thus, racial classifications which effect invidious discrimination are forbidden but may be upheld if deemed necessary to accomplish an overriding governmental purpose. Cf. McLaughlin v. State of Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). In Tancil v. Woolls, 379 U.S. 19, 85 S.Ct. 157, 13 L.Ed.2d 91 (1964), the Court approved a requirement that the racial identification of divorced parties be recorded and kept by the state. See also Ex parte Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944); Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194; Kirabayashi v. United

---

Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564 (1965).

3. Thus far the Supreme Court has refused to review either cases approving or disapproving affirmative action to correct racial imbalance. Balaban v. Rubin, supra; Bell v. School City of Gary, Indiana, supra, and Downs v. Board of Education of Kansas City, Kansas, supra.

**982**

States, 320 U.S. 81, 63 S.Ct. 1375, 87 L. Ed. 1774 (1943).

Therefore, from a careful study and review of all of the evidence in this case, and the pertinent authorities, commencing with the first Brown v. Board of Education 1954 decision to the current decisions, the Court holds and concludes that the defendant, Oklahoma City Board of Education, must take clear, affirmative, aggressive action to bring about desegregation as pronounced in the foregoing authorities. The suggested action set out in the expert, non-biased, non-prejudiced, independent report on integration of the public schools of Oklahoma City is a good start, but it of and in itself cannot and will not be the full solution of the problem. Further study, planning, and action is and will be necessary.

This Opinion and the findings set forth and the authorities set forth as herein stated will be treated as Findings of Fact and Conclusions of Law, and based upon the Opinion, appropriate Order will be entered and filed.